## COMMISSIONER OF INTERNAL REVE-NUE v. CLARION OIL CO.

### No. 8586.

United States Court of Appeals
District of Columbia.

Argued Jan. 24, 1945.

Decided March 12, 1945.

Writ of Certiorari Denied June 18, 1945.

See 65 S.Ct. 1580.

672

Mr. Hilbert P. Zarky, of Washington, D. C., of the Bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of court, with whom Assistant Attorney General Samuel O. Clark, Jr., and Messrs. Sewall Key and Warren F. Wattles, Special Assistants to the Attorney General, were on the brief, for petitioner. Messrs. J. P. Wenchel, Chief Counsel, and Rollin H. Transue, Special Attorney, of the Bureau of Internal Revenue, both of Washington, D. C., also entered appearances for petitioner.

Mr. Floyd F. Toomey, of Washington, D. C., with whom Messrs. Ellsworth C. Alvord and C. Rudolf Peterson, both of Washington, D. C., were on the brief, for respondent.

Before GRONER, Chief Justice, and MILLER and ARNOLD, Associate Justices.

GRONER, C. J.

This is a petition on behalf of the Commissioner to review a decision of the Tax Court in a case involving a personal holding company surtax determined by the Commissioner, but rejected by the Tax Court, for the calendar year 1937. Taxpayer was incorporated in 1911 for the purpose of "the establishment and maintenance of an oil company with authority to contract for the lease and purchase of the right to prospect for, develop and use coal and other minerals and petroleum." Prior to 1937 it was not a "personal holding company," but for that year the statutory requirements to bring it within that classification were found by the Commissioner to be present.

Some time prior to 1936 taxpayer acquired a three-fourths' interest in lessee rights under an oil, gas and mineral lease on land located in Harris County, Texas. This interest was acquired by assignment from the assignee of the original lessee. The five-year term of the lease expired in November, 1938, but could have continued had oil, gas, or mineral been found. In July, 1937, taxpayer assigned its interest in the lease to Humble Oil & Refining Company for a cash consideration of $120,-000.00, an oil payment of $240,000.00 out of a share of oil if, as and when produced, and an overriding royalty of ⅛₂nd of oil which might be produced. Before expiration of the lease, Humble Oil Company in 1938 drilled on the property a "dry hole," and the lease was abandoned. Since no oil was produced, taxpayer received nothing from the lease or the assignment except the $120,000.00 cash payment received in 1937. In its corporation tax return for that year taxpayer included as taxable income the sum so received and took the statutory "depletion" deduction of $33,000.-00, being 27½% of that amount. In his determination of the tax, the Commissioner held the $120,000.00 payment to be "advance royalty" or rent, and therefore personal holding company income under sub-sections (g) or (h) of § 353 of the Revenue Act of 1937.[1]

\*       \*       \*       \*       \*       \*

"(g) RENTS.—Rents, unless constituting 50 per centum or more of the gross income. For the purposes of this subsection the term 'rents' means compensation, however designated, for the use of, or right to use, property; but does not

---

[1] 26 U.S.C.A. Int.Rev.Code, § 502(g), (h), 50 Stat. 813, 814: "Sec. 353. PERSONAL HOLDING COMPANY INCOME. For the purposes of this title the term 'personal holding company income' means the portion of the gross income which consists of:

The Tax Court rejected the Commissioner's holding [2] and decided that the payment received was neither rent nor royalty within either sub-section, and accordingly did not constitute "personal holding company income," and from that decision the Commissioner appeals to this court.[3]

It will thus be seen that the main question is whether the $120,000.00 cash payment was *personal holding company income* for the taxable year 1937, and, the other elements necessary to constitute taxpayer a personal holding company being present, the answer turns upon whether that amount was received by the taxpayer either as rents under § 353(g), or as royalties under § 353(h). The Tax Court, as we have seen, held it was neither the one nor the other. On the argument in this court the Commissioner insists primarily that it was "royalty" and only in the alternative that it might have been "rent."

We are in accord with the view of the Tax Court that the payment was not "rent," and, for the purposes of this case, we adopt the reasons stated by the court in its opinion [4] on that subject.

The question whether the $120,000.00 cash payment was a royalty, presents a much more difficult problem, and the answer depends upon whether the term— royalty—should be construed in its usual and ordinary sense or whether it must be construed so as to give, if possible, a more nearly uniform application to the general federal scheme of taxation.[5] The word "royalty," it is said, originated in England, where it was used to designate the share in production reserved by the Crown from those to whom the right to work mines and quarries was granted; and, generally speaking, that is the definition applied in most of the States in the interpretation of State statutes in which the term appears.[6]

In Oklahoma, where they are perhaps more frequently used than elsewhere, the words "bonus," "rental" and "royalty" are construed in their ordinary and popular sense, "bonus" meaning the cash consideration or down payment, paid or agreed to be paid, for the execution of the lease; "rental" being the consideration for the privilege of delaying the drilling operation; and "royalty" being the share of the produce reserved to the owner for permitting another to exploit and use the property.[7] Similarly, in Kansas, royalty is said to be the share in oil and gas produced and paid as compensation for the right to drill and produce; in Montana it is the share of the production or profit paid the owner; and in Texas, the share of the produce or profit reserved by the owner for permitting another to use the property. Innumerable other similar examples might be given, but reference to the decisions of the Supreme Court involving federal taxation shows that that Court has repeatedly said that State decisions on the subject control only when the federal taxing Act, by express language or necessary implication, makes its operation dependent upon State law; hence, lacking a Congressional definition, interpretation should always be made to give uniformity to the national tax scheme.[8] By reference to decisions of the Supreme Court, applying this rule, it convincingly appears that in cases involving claims to "depletion" deductions, the Court has consistently rejected the generally accepted definitions of the word "bonus" as describing a cash consideration paid for the execution of a lease and held it to be what is called an "advance royalty"—or,

---

include amounts constituting personal holding company income under subsection (f).

"(h) Mineral, Oil, or Gas Royalties.—Mineral, oil, or gas royalties, unless (1) constituting 50 per centum or more of the gross income, and (2) the deductions allowable under section 23(a) (relating to expenses) other than compensation for personal services rendered by shareholders, constitute 15 per centum or more of the gross income."

2 1943, 1 T.C. 751.

3 This court derives its jurisdiction from 26 U.S.C.A. Int.Rev.Code, § 1141(b) (1), the taxpayer having made "no return" as a personal holding company. Cf. Commissioner v. Lane-Wells Co., 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684, where the jurisdiction question apparently was not considered.

4 1 T.C. 751, 755.

5 Burnet v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199.

6 Vincent v. Bullock, 192 La. 1, 187 So. 35, 39.

7 Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773, 775.

8 Burnet v. Harmel, 1932, 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199; Thomas v. Perkins, 301 U.S. 655, 659, 57 S.Ct. 911, 81 L.Ed. 1324.

transposed, a royalty paid in advance, and in all respects subject to depletion as a *royalty* arising out of a share of the product reserved.[9] This is qualified only to the extent that in addition to the bonus an "economic interest" in the oil, in place, must be reserved by the recipient of the bonus. This interest is implied from the retention of any "right to share in the oil produced." [10]

The inevitable result of this is to indicate that the word "bonus", as used in oil leasing parlance, is, in relation to federal taxation, included in the word "royalty;" and this meaning had become fixed and certain before Congress enacted the Revenue Act of 1934,[11] wherein royalty income of a personal holding company was first subjected to the surtax here under consideration. It therefore follows that the $120,000.00 received by the taxpayer, being, as it insists, a bonus, yet, connected as it was with the retention of a royalty interest in oil, was itself a "royalty" without regard to whether oil was or was not subsequently discovered and produced. And all of this, of course, goes back to the prop-. osition, unqualifiedly adopted by the Supreme Court, that the usual acceptation of the meaning of terms or words in State court decisions is not controlling in those instances in which to do so would disarrange the uniformity of the federal tax laws. And certainly nothing would contribute more to lack of uniformity than to say on the one hand that a cash payment —called a bonus—received in consideration of an oil lease is subject to "depletion" deductions, as is uniformly held, and then to deny that it is a royalty because it lacks some of the characteristics colloquially applied to that term. The cases cited in footnote 9 fully illustrate this principle. No particular good will be accomplished in repeating the language of these cases, but in all of them, where the question was whether the bonus was a capital gain and hence taxable under the provision for capital gains and losses, or was ordinary income for which no depletion was allowed, or was a royalty, subject to depletion, the courts, including the Supreme Court, have agreed that for federal tax purposes it is in the

---

9 Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Burnet v. Harmel, supra; Murphy Oil Co. v. Burnet, 1932, 287 U.S. 299, 300, 53 S.Ct. 161, 77 L.Ed. 318; Bankers Pocahontas Coal Co. v. Burnet, 1932, 287 U.S. 308, 53 S. Ct. 150, 77 L.Ed. 325; Herring v. Commissioner, 1934, 293 U.S. 322, 55 S.Ct. 179, 79 L.Ed. 389; Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Houston Farms Develop. Co. v. United States, 5 Cir., 1942, 131 F.2d 577; cf. Work v. United States ex rel. Mosier, 261 U.S. 352, 43 S.Ct. 389, 67 L. Ed. 693.

10 Palmer v. Bender, supra, 287 U.S. at page 557, 53 S.Ct. 225, 227, 77 L.Ed. 489; Helvering v. Elbe Oil Land Co., 1938, 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904.

Taxpayer insists that the following colloquy in Congress between Congressman Vinson and Congressman Disney clearly indicates that bonus payments for leases were not intended to be included as royalties:

"Mr. Disney. Royalties in this connection are distinguished from *trading in royalties or royalty interest.* These must be actual royalties paid from production?

"Mr. Fred M. Vinson. The gentleman is correct.

"Mr. Disney. As distinguished from *deals in leases* or operations?

"Mr. Fred M. Vinson. Royalties re- ceived from patents or copyrights are included.

"Mr. Disney. Yes. I understand they are included.

"Mr. Fred M. Vinson. Yes.

"Mr. Disney. Royalties per se are what is meant?

"Mr. Fred M. Vinson. *Trading in royalties or gains made in transactions of that kind* would not be the royalty income referred to herein.

"Mr. Disney. No; that is what I am getting at, that there must be actual royalties from actual production from property producing oil.

"Mr. Fred M. Vinson. That is correct as it affects oil." [Italics supplied.] 81 Cong.Rec. 9032 (1937).

But if this may be considered at all as an expression of Congressional intent, we think the italicized phrases are evidence of the distinction made herein, i. e., the receipt of a cash bonus *in addition* to an interest in the oil differs from a cash payment for a lease the entire interest in which is assigned. Helvering v. Elbe Oil Land Co., supra. For a more comprehensive discussion see the testimony of R. C. Fulbright, representing certain mineral-royalty companies, Hearings before Committee on Ways & Means on Tax Evasion and Avoidance, 75th Cong. 1st Sess. (1937) 85–107.

11 48 Stat. 751 (1934), 26 U.S.C.A. Int. Rev.Acts, page 757.

last named class, and subject to the conditions applicable to royalties.

■ Accordingly, we think the Commissioner was correct in placing taxpayer in the personal holding company category and in assessing a tax on its undistributed income; and consequently, the Tax Court's decision to the contrary is reversed.

This brings us then to another question arising out of the following facts: Taxpayer for the year 1937 had net income amounting to $162,386.45. On this sum it paid when due in March, 1938, a normal tax of $14,454.02 and an excess profits tax of $1,448.80, aggregating $15,902.82. There was also distributed to its stockholders $115,000.00 in dividends. Of the $162,386.45 there thus remained "undistributed" or "accumulated" income in the amount of $31,483.63. But the Commissioner disallowed the deduction of the $15,902.82 which had accrued in 1937, in computing the taxpayer's personal holding company surtax liability. This surtax,[12] which may properly be called a penalty tax (65% of the *undistributed* net income up to $2,000—75% of the balance), amounted to $35,000.44.

■ The question, in this aspect, is whether the penalty tax should have been calculated on the whole amount of the difference between net income and dividends ($162,386.45 minus $115,000.00), or whether the amount of tax paid by taxpayer on ordinary income ($15,902.82) should also have been deducted. The Act provides that undistributed income subject to penalty tax shall be the net income less "(1) Federal income, war-profits, and excess-profits taxes paid or accrued during the taxable year * * *." § 356, 26 U.S.C.A. Int.Rev.Acts, page 976. The Tax Court, having first declared the question moot, because of its holding that the taxpayer was not a personal holding company, nevertheless, decided the question against taxpayer on the ground that its ordinary income taxes were *neither paid nor accrued* in the taxable year and that "a taxpayer upon a cash basis is entitled to a credit of only the amount of tax 'paid' within the year." But we think this conclusion is a mistake of law. As we have seen, the Act permits deductions, for the purpose we are discussing, of income taxes "paid or accrued during the taxable year." The taxable year in question is 1937, and admittedly the *payment* of the income tax was in 1938, but the statutory words are "paid or accrued." And we think there can be no manner of doubt that taxpayer's income tax for the taxable year 1937 "accrued" in that year. It seems to us to be beside the point to say, as the Tax Court thought, that the word "accrued" in the circumstances we are considering must be construed in reference to the manner in which taxpayer keeps his accounts, i. e., whether on the cash or the accrual basis. The statutory definition of the words, found in Title I of the Act,[13] and on which the Tax Court presumably relied, declares that "the terms 'paid or incurred' and 'paid or accrued' shall be construed according to the method of accounting upon the basis of which the *net income* is computed under this Part." [Italics supplied.] But, obviously, this definition was intended to apply to the method of computing *net income,* and has no reference or relevancy to the subject matter of what, for the purposes of the newly added provision in relation to personal holding companies, is taxable as *undistributed* income.[14] In other words, having determined "net income" in accordance with the accounting methods of the taxpayer, there is no need to consider whether an ordinary income tax was "paid" or whether it was "accrued," since in either event it was a deductible item and no longer represented *accumulations* of income, which it was the intent of this tax to force out of the "incorporated pock-

---

[12] 50 Stat. 813, Revenue Act of 1937, 26 U.S.C.A. Int.Rev.Acts, page 973: "Sec. 351. Surtax on Personal Holding Companies. There shall be levied, collected, and paid, for each taxable year (in addition to the taxes imposed by Title I), upon the undistributed adjusted net income of every personal holding company a surtax equal to the sum of the following: (1) 65 per centum of the amount thereof not in excess of $2,000; plus (2) 75 per centum of the amount thereof in excess of $2,000."

[13] 49 Stat. 1669 (1936), 50 Stat. 817, § 357 (1937), 26 U.S.C.A. Int.Rev.Code, § 48(c).

[14] Cases dealing with the deduction of federal taxes for purposes of "net income" are therefore inapposite. See United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; United States v. Mitchell, 271 U.S. 9, 46 S.Ct. 418, 70 L. Ed. 799.

676

etbook" and into the hands of individual taxpayers.[15]

■ The taxpayer's "method of accounting" could, on no theory that we know of, affect the applicability of the provision which specifically permits, for the purposes of this section, the deduction from the adjusted net income of taxes paid on ordinary income. It is enough if the tax for that income was either "paid or accrued" in the taxable year. There is absent the administrative need for uniformity which exists for the computation of *net* income. And this view·is confirmed in a fair consideration of the statutory sequence of events, or, stated somewhat differently, the several steps in the ascertainment and payment of taxes exacted under this provision of the Act. First, there must be the ascertainment of net income and the calculation of the amount of tax thereon and obviously this could not be determined in most cases until the end of the last day of the taxable year. Next, the determination of the amount of distribution to stockholders, and lastly, the ascertainment of the penalty tax which is accomplished by deducting from the ascertained net income (a) the amount of dividends paid, (b) the amount of ordinary taxes paid or accrued, and then applying the penalty to what remains as undistributed net income. The scheme as a whole contemplates the application of the penalty tax solely to the income transactions of a single tax year, and it is income remaining after dividend disbursements and tax payments *for the taxable year* which is attacked by this surtax. Hence *taxes* paid for a *previous* year, just as net *income* from a previous year, have no proper place in the calculation.[16] For these purposes it is a fair conclusion that income taxes are deemed to be paid out of income for the year for which they are levied. Accordingly the allowance, as a deduction, of taxes amounting to $452 paid on *1936* income, as the Tax Court here found permissible, was wrong. By way of illustration, if in the year 1937 respondent had paid $162,000, instead of some $400, in income taxes for the taxable year *1936*, when, as is agreed, it was not a personal

holding company, it could, on the basis of the Tax Court's decision, have held undistributed its entire net income for 1937, in which year it was a personal holding company, without being subject at all to the penalty tax, and that, of course, is precisely·what Congress aimed to prevent. Nor did Congress intend that the taxpayer on an accrual basis who entered in his books an arbitrary amount as "reserve for taxes," should be in a better position than the taxpayer on a cash basis, who prudently held in hand a sufficient sum for the payment of the same tax when ascertained and payable. This result seems to us necessarily to follow from the publicly declared Congressional purpose of preventing the accumulation of undistributed income by personal holding companies by imposing a super tax thereon. Accordingly, if in the present case the taxpayer, whatever its accounting methods, had *in 1937* distributed in dividends, instead of a part, its whole net income, it would have been subject to no additional tax. If, instead, it had distributed all except a sum equal to its normal income taxes for 1937, payable in 1938, and then had tendered in payment this undistributed amount, the Commissioner never in the world would have contended it should also pay the penalty tax on the sum so reserved,—for that sum was not undistributed income in the statutory sense, but for all practical purposes was "earmarked" for payment of accrued taxes not then payable. And the only difference between that case and this is that here it reserved not only the sum necessary to pay its tax when due, but an additional sum as well; and it is on this additional amount alone that the penalty is assessable.

■ As stated before, we believe the relevancy of the statutory definition· of "paid or accrued" is applicable to the determination of *net* income, and not to *undistributed* income. The Government brief in this court did not argue the question, however, and it may be that the Commissioner's contention is that, even though "paid or accrued" refers to the *tax*, and not the method of ·bookkeeping, these taxes did not "accrue" *during the taxable year.*

15 Report of the Joint Committee on Tax Evasion and Avoidance, 75th Cong. 1st Sess. (1937) 7.

16 The entire scheme of federal taxation is based upon the transactions of a single year. Burnet v. ·Sanford & Brooks Co., 1930, 282 U.S. 359, 365, 51 S.Ct. 150, 75

L.Ed. 383; cf. Fawcus Machine Co. v. ·United States, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397, where it is said: "A corporation cannot claim to have accumulated any net income in any year until provision is made for taxes accrued, based on net income for the same year."

But we think the reasonable and fair conclusion is that the word "accrued" should be given its usual and ordinary meaning, and that this means neither more nor less than that the tax accrues when the liability arises, although not yet due and payable, and that to treat it otherwise would be contrary to the basic legislative purpose.

A similar question arose out of the 1921 Act, 42 Stat. 227, and there the position of the Commissioner was the exact reverse of what it is here. There it was contended by the taxpayer that the repeal of Title 4 of the Revenue Act of 1918, 40 Stat. 1096 (estate tax) abolished the tax upon estates of those who died within a year of the date when the Act of 1921 took effect. This because the tax was not due (under the 1918 Act) for a year, and therefore did not *accrue* until after the repeal (1921 Act), which saved only "accrued" taxes. The Second Circuit decided the point for the Commissioner in the following language: [17]

"The argument presupposes that the word 'accrued' has a far more rigid content than we can gather from the decisions of the Supreme Court on which the appellants rely, and the consequences of the construction they invoke are so extravagant that it seems to us impossible to ascribe any such purpose to Congress, in the absence of the plainest necessity. We of course recognize that a taxing statute must carry its own warrant on its face in the clearest terms (Crooks v. Harrelson, Nov. 24, 1930 [282 U.S. 55], 51 S.Ct. 49 [75 L.Ed. 156]), and there would be no escape here, if the language were immutable, whatever the context. We are satisfied that this is not true, and, in view of the concensus of authority in the lower courts upon the point, it seems to us unnecessary to analyze the decisions of the Supreme Court, or give our reasons for thinking that they do not require any such conclusion."

■ Considered from the viewpoint we have discussed, we are of the opinion that the ordinary income tax—paid by taxpayer in March, 1938—accrued within the meaning of the personal holding company undistributed income clause when the liability became fixed—in 1937—although not due or payable until a later date. [18]

■ This leaves only for disposition the question whether the imposition of a delinquency tax of 25% for failure by respondent to file a personal holding company return was proper. Section 291 of the Act [19] imposes the penalty, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." The Tax Court having decided this case on the merits in favor of respondent-taxpayer, made no holding on the penalty issue. As we have already had occasion to notice, respondent was not a personal holding company prior to 1937, and to make it one for that year it is necessary to hold that the $120,000 bonus, of which we have spoken, was either rent or royalty. It was stipulated and so found by the Tax Court that respondent in preparing its return for 1937 had no thought that the bonus payment would be considered personal holding company income, i. e., rent or royalty, or that it would be classified as a personal holding company. And there is substantial reason for this belief on its part, as is shown by the fact that the Tax Court, when the question arose, held it not to be rent or royalty, and this holding was in accordance with its previous decision in Porter Property Trustees, Ltd., v. Commissioner of Internal Revenue, 1940, 42 B.T.A. 681, in which decision the Commissioner had announced his acquiescence—until withdrawn three years later. Considered in the light of the pronouncement of the Supreme Court on the same subject, in Spies v. United States, 317 U.S. 492, 496, 63 S.Ct. 364, 367, 87 L.Ed. 418, that:

"It is not the purpose of the law to

---

[17] Alker v. United States, 2 Cir., 47 F. 2d 229, 230.

[18] United States v. Anderson, 269 U.S. 422, 441, 46 S.Ct. 131, 134, 70 L.Ed. 347: "In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and

determine the liability of the taxpayer to pay it'; Alker v. United States, D.C., 38 F.2d 879, 883 (and cases cited therein), 2 Cir., 47 F.2d 229, certiorari denied 283 U.S. 842, 51 S.Ct. 489, 75 L.Ed. 1452; Cochran's Ex'r v. Commonwealth, 241 Ky. 656, 44 S.W.2d 603, 78 A.L.R. 710.

[19] 49 Stat. 1727 (1936), amended 50 Stat. 813 (1937), now 26 U.S.C.A. Int.Rev.Code, § 291.

penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care"—

it would seem that there is little. to be said in this case to justify the imposition of the penalty, but since the question is one of fact and was not considered or decided by the Tax Court, and since this case must be returned to it for a recalculation of the tax in accordance with this court's opinion, we think the matter should be returned to it unaffected by any views of ours on the subject.

The imposition of the penalty will then be reconsidered on taxpayer's seasonable application. See Commissioner v. Lane-Wells Co., 1944, 321 U.S. 219, 224, 64 S. Ct. 511, 88 L.Ed. 684.

Reversed and remanded to the Tax Court for proceedings in accordance with this opinion.

Reversed and remanded.