OPINION. Johnson, Judge-. Section 501 of the Internal Eevenue Code provides that the term “personal holding company” means any corporation, if (a) at least 80 per cent of its gross income for the taxable year is derived from royalties, and (b) at any time during the last half of the taxable year more than 50 per cent in value of its outstanding stock is owned, directly or indirectly, by not more than five individuals. It has been stipulated by the parties that petitioner is a personal holding company in so far as stock ownership is concerned. Their disagreement arises from the respondent’s determination that the income of petitioner for the taxable years consisted of “royalties” and, therefore, personal holding company income within the meaning of section 502 (a) of the Internal Eevenue Code. The petitioner contends that the payments it received under contracts with Australian shoe manufacturers were compensation for services rendered, and not royalties. The term “royalties” is not defined in the Internal Eevenue Code. Subsection (8) of section 29.502-1 of Eegulations 111 states that the term “includes amounts received for the privilege of using patents, copyrights, secret processes and formulae, good will, trade-marks, trade brands, franchises and other like property,” and this Court has defined the term “as a payment or interest reserved by an owner in return for permission to use the property loaned and usually payable in proportion to use.” United States Universal Joints Co., 46 B. T. A. 111, 116. The only witness for the petitioner was its president, Edward Greensfelder. He was interrogated as to the services petitioner rendered in connection with each of the contracts with Australian manufacturers. He testified that he rendered some legal services for which his law firm was compensated; that he arranged for representatives or factory managers of Australian manufacturers to go through the plants of several American manufacturers, where they received information and materials pertaining to the manufacture of shoes; that he procured some sample shoes and other materials and shipped them to Australian manufacturers; and that he received letters from them asking for information and forwarded, or arranged to have it forwarded, to them. No letters asking for or supplying information were introduced in evidence. Erom his testimony it clearly appears that any services rendered by petitioner’s other officer, Warren Browne, were negligible and consisted of a visit to a. factory and purchasing and mailing some fashion magazines to Australia. J. Goldberg was not an officer or employee of petitioner. The Australian manufacturers paid petitioner approximately $23,500 in 1945 and $35,000 in 1946. We are not convinced that these substantial payments were made for the services testified to by Greensfelder. Neither are we convinced that, if all the Australian manufacturers wanted and all that the petitioner was to supply for the consideration received was information and services, petitioner would have entered into contracts, such as that with Dixon-Bartlett Co. mentioned in our findings, wherein it acquired the right to grant to Cinderalla Shoes Pty. Ltd., or to any other Australian or New Zealand manufacturer, the right, privilege, and license to manufacture from models, styles, or models of lasts supplied by Dixon-Bartlett Co. ladies’ shoes for sale and/or distribution in Australia or New Zealand, and to that end, to make available to such Australian or New Zealand manufacturer any or all models, styles, models of lasts, or other information supplied by Dixon-Bartlett Co. We are satisfied from the evidence that what the Australian manufacturers wanted was the exclusive privilege or license to manufacture certain styles and designs of American shoes in the territory comprising Australia and New Zealand. If the agreements between petitioner and those manufacturers had specifically provided for the transfer of such a privilege or license, and essential information and materials necessary to the manufacture of the particular styles and designs of shoes in which they were interested, the petitioner could not logically contend that all it furnished was services, and we do not think the agreements here involved, when effect is given to their substance rather than to their form, warrant the conclusion that the payments made by the Australian manufacturers and received by petitioner were only for services. The agreements provided that petitioner would assist in the designing and styling of shoes to be manufactured in Australia and New Zealand and make available to the particular Australian manufacturer involved information required as to styles, materials, and colors of shoes to be manufactured, as well as information regarding lasts, heels, trims, and similar matters, and that those services and information would not be furnished to any other person or party located in Australia or New Zealand. Our construction of these provisions is that they granted to the Australian manufacturer the exclusive privilege and license to manufacture shoes .embodying certain designs and styles, and that this was the principal thing of value received. We are.not concerned with the fact that the petitioner acquired the right to grant this exclusive privilege and license by contract in two instances-and in some undisclosed manner in the case of the Marge Mason (women’s) shoes and Packard (men’s) .shoes. The contracts with the Australian .manufacturers .indicate .that the right was acquired in some manner, and, as a result, petitioner was able to assure each manufacturer that the information and materials essential to the manufacture of the particular designs and styles of shoes in which each manufacturer was interested would not be furnished to any other Australian manufacturer. This conclusion is clearly shown by the written contracts between petitioner and two of the American manufacturers and the assignment of the rights thereunder by petitioner to its Australian clients. "While the evidence fails to reveal written contracts as to the Marge Mason and Packard shoes, yet in both instances substantial sums were paid by petitioner in both taxable years to each of these American manufacturers, and in turn substantial sums were received by petitioner from its Australian clients, and the consideration paid and received, together with all other circumstances in the case, clearly indicates that these two transactions were of the same general nature as those covered by the written contracts. Each contract provided that the payments to petitioner were to be measured, except in instances where the minimum guarantee provided for therein was applicable, by the number of pairs of shoes manufactured, and they ranged from 7 to 50 cents per pair. The contracts clearly contemplated payments in proportion to use, and, if no services were involved, all of these payments would fall within the definition of the term “royalties” contained in United States Universal Joints Co., supra. In the cited case, where the taxpayer proved that similar payments were made in part for the right to manufacture and use a patented joint and in part for technical services rendered by its officers, and that more than 20 per cent of the payments were for technical services, this tribunal held that the taxpayer was not a personal holding company during the taxable year involved. In Lane-Wells Co., 43 B. T. A. 463; affd., 134 Fed. (2d) 977; certiorari denied, on this issue, 320 U. S. 741, however, where the taxpayer failed to present evidence showing what part, if any, of payments received in connection with the assignment of an exclusive license agreement to other companies was for engineering services, our holding was that all of the payments were royalties and that the taxpayer was a personal holding company. In the instant proceeding the petitioner was not engaged in the business of manufacturing or designing shoes and its officers were not qualified to render any technical services to Australian shoe manufacturers. We think it is reasonable to assume that as shoe manufacturers they knew how to manufacture shoes, and, once they acquired the privilege or license to manufacture American type shoes (embodying certain designs or styles in their territory, the only service ¡they expected of petitioner was that it make available to them information as to American production methods and information and materials essential to the manufacture of the particular designs and styles of shoes involved, such as sample shoes, lasts, materials and colors, trims, and similar matters. The contracts provided that the information and materials were to be furnished to a representative of each Australian manufacturer in the United States, and during the two years here involved the petitioner’s services consisted of referring several representatives of these manufacturers to the American manufacturers or designers involved, where they received the information and materials desired, and, in a few instances, sending sample shoes and other data to Australia. Petitioner has not proved to our satisfaction that more than 20 per cent of the payments it received during each of the taxable years should be allocated or was allocable to services which it rendered. Neither has it proved that at least 80 per cent of these payments should not be allocated or was not allocable to the use of the exclusive privilege or license which each Australian manufacturer acquired to manufacture shoes using or embodying certain models or styles. Under these circumstances the respondent’s determination that at least 80 per cent of petitioner’s gross income for the taxable years was derived from royalties, and that petitioner was a personal holding company, must be approved. Decision will ~be entered for the respondent.