JOHNSON INVESTMENT & RENTAL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 834-76.     Filed September 11, 1978.

*Terence C. Porter,* for the petitioner.
*James E. Cannon,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioner's Federal corporate income taxes:

| Year ending Jan. 31— | Deficiency | Year ending Jan. 31— | Deficiency |
|---|---|---|---|
| 1966 | $14,927.21 | 1969 | $13,228.97 |
| 1967 | 10,394.73 | 1970 | 12,036.84 |
| 1968 | 8,394.88 | 1971 | 3,198.80 |

Each party has conceded certain issues. The issues remaining for decision are: (1) Whether the petitioner received royalties within the meaning of section 543 of the Internal Revenue Code of 1954[1] as a result of a "lease" allowing the tenant to quarry minerals on the leased premises and requiring a payment of 5 cents for each ton of rock sold from the stone quarried thereon; and (2) if the petitioner is a personal holding company, whether it is entitled to a deduction for payment of qualified indebtedness in excess of the amount allowed by the Commissioner.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Johnson Investment & Rental Co. (Johnson), is a Missouri corporation whose principal place of business was in Columbia, Mo., at the time it filed its petition in this case. It filed its Federal corporate income tax returns on the basis of a taxable year ending January 31, and we shall identify each taxable year by the calendar year in which it ended. For its taxable years 1966, 1967, 1968, and 1969, it filed its Federal corporate income tax returns with the District Director of Internal Revenue, St. Louis, Mo. For the taxable years 1970 and 1971, such returns were filed with the Internal Revenue Service Center, Kansas City, Mo.

During the years in issue, the petitioner held a number of investment properties. Harold E. Johnson, Sr.; his wife, Nancy; his children, Sally Johnson Grice and Harold E. Johnson, Jr.; and his grandchildren owned all but 1 share of the outstanding stock of the petitioner. Harold E. Johnson, Sr., also owned, directly or indirectly, 99⅔ percent of the stock of Boone Quarries, Inc. (Boone).

On July 18, 1957, Boone purchased an unimproved tract of land, known as Semon farm, for the purpose of operating a quarry thereon. Boone spent approximately $8,000 removing overburden and otherwise preparing Semon farm, before actually commencing its quarrying operation in 1959. Since then, Boone has successfully operated a quarry on Semon farm.

Such business involves locating the rocks, removing the

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

overburden, hauling the rocks to the mill where they are crushed and screened into various gradations of size and hardness, and stockpiling the crushed rock on the premises for sale. In 1959, 25 to 30 percent of Semon farm was used in some aspect of Boone's quarrying operation. Over the ensuing years, Boone gradually expanded its quarrying operation to include 60 to 75 percent of Semon farm. By 1977, Boone had on the Semon farm, in addition to the quarry, two mills, three shops, a State highway inspector's office, two scales, numerous items of equipment, a scrap area for used equipment, and an inventory of crushed rock, which generally fluctuated between 60,000 and 110,000 tons. During the entire period that Boone conducted its quarrying business on Semon farm, no one else used, or was authorized to use, Semon farm for any purpose. Furthermore, because of the quarrying operation, no part of Semon farm was suitable for most other contemporaneous uses.

In 1961, Boone decided to expand its quarrying operation. To obtain the necessary financing, Boone sold Semon farm to Johnson on July 12, 1961, for $36,000. On August 15, 1961, Johnson and Boone entered into the following agreement:

1. * * * [Johnson] does hereby lease unto * * * [Boone] and * * * [Boone] does hereby lease from * * * [Johnson] for the purpose of operating a stone quarry thereon the following described tract of land known as the Semon farm: * * *

2. The term of this lease shall be for a period of two (2) years commencing August 15, 1961 and ending August 14, 1963.

3. The consideration for this lease shall be an annual rental equal to Five Cents (.05) for each ton of rock sold by * * * [Boone] from the stone quarried on the above described real estate.

4. At the termination of this lease * * * [Boone] shall have the right to remove from the premises and retain as its own all equipment, fixtures, machinery and inventory owned by it.

At the expiration of the lease on August 15, 1963, Boone and Johnson continued such arrangements on a monthly basis until March 31, 1964, when they agreed to extend the term of the lease to August 15, 1965. Later, Johnson and Boone agreed to a 1-year lease, effective as of August 15, 1965, which otherwise was the same as the prior leases except that it would be renewed automatically for additional 1-year terms, unless one of the parties gave notice of its intention to terminate the lease at least 60 days before the expiration date. Such agreement was in effect during each of the years in issue.

For its taxable years 1963 through 1971,[2] Boone made the following payments to Johnson, and each year such payments were denominated "Royalties Paid" and were included in its cost of goods sold:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1963 | $7,675.02 | 1968 | $13,431.49 |
| 1964 | 12,443.31 | 1969 | 15,670.89 |
| 1965 | 12,797.27 | 1970 | 23,955.62 |
| 1966 | 17,643.80 | 1971 | 18,366.85 |
| 1967 | 15,905.93 | | |

Johnson reported such amounts in its gross income as "royalties" for its taxable years 1963 through 1971. In addition, both Johnson and Boone referred to such payments as royalties in protests which were filed on their behalf with the Internal Revenue Service for their 1963, 1964, and 1965 taxable years.

Johnson incurred indebtedness of $28,000 in 1958 and $132,000 in 1961. For its taxable years 1965 through 1971, the petitioner made principal payments with respect to such indebtedness, was allowed deductions for depreciation, and had net long-term capital gains and taxes imposed attributable to such gains as follows:

| Year | Repayment of qualified indebtedness | Depreciation deduction | Net long-term capital gain | Taxes attributable to gain |
|------|------|------|------|------|
| 1965 | $14,705.71 | $6,915.99 | 5,067.00 | $1,418.77 |
| 1966 | 15,588.23 | 9,382.56 | --- | --- |
| 1967 | 16,524.12 | 18,085.66 | --- | --- |
| 1968 | 16,718.68 | 21,006.77 | 76,773.25 | 19,356.32 |
| 1969 | 14,881.15 | 20,278.25 | 47,905.17 | 13,173.92 |
| 1970 | 15,808.37 | 16,929.70 | 4,004.76 | 1,198.25 |
| 1971 | 16,793.55 | 16,128.44 | --- | --- |

The petitioner had no net short-term capital losses during the years in issue.

The parties agreed that for its taxable years 1963 and 1964, Johnson was not a personal holding company under the law then in effect, but that it would have been such a company if the personal holding company provisions as amended by the

---

[2]Boone used a taxable year ending on Mar. 31, and we shall identify each taxable year by the calendar year in which it ends.

Revenue Act of 1964, Pub. L. 88–272, 78 Stat. 79, had been in effect for such years.

The petitioner did not file personal holding company returns for any of the years in issue; nor did it, in its Federal corporate income tax return for each of the years in issue, indicate that it was a personal holding company. In his notice of deficiency, the Commissioner determined that the petitioner was a personal holding company with the following amounts of undistributed personal holding company income subject to tax under section 541:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1966 | $22,015.12 | 1969 | $17,282.07 |
| 1967 | 15,175.61 | 1970 | 15,692.84 |
| 1968 | 12,161.06 | 1971 | 7,326.51 |

## OPINION

The primary issue for decision is whether the petitioner is a personal holding company and therefore subject to the 70-percent tax imposed by section 541 on undistributed personal holding company income. Section 542(a) defines a personal holding company and provides that a corporation is treated as such a company if at least 60 percent of its "adjusted ordinary gross income" for the taxable year is "personal holding company income" and if, during the last half of the taxable year, more than half of the corporation's stock is owned by not more than five individuals. Sec. 542(a)(1) and (2). Personal holding company income, as defined by section 543(a), generally includes rents and royalties. However, rents are not such income if they constitute 50 percent or more of the adjusted ordinary gross income of the corporation and if the corporation's other personal holding company income, adjusted for certain dividends, is 10 percent or less of the corporation's ordinary gross income for the taxable year. Royalties are also excludable from personal holding company income if they meet similar conditions.

For each of the years in issue, the parties agree that Johnson met the ownership test of section 542(a), that its rental income (excluding the mineral payments received from Boone) was more than 50 percent of its adjusted ordinary gross income, and that its personal holding company income (excluding rents and such mineral payments) was 10 percent or less of its ordinary gross income. If such mineral payments constitute rental income

within the meaning of section 543(a), then Johnson's rental income is not treated as personal holding company income, and it is not subject to the personal holding company tax. On the other hand, if such mineral payments constitute royalties within the meaning of section 543(a), then Johnson's rental income is treated as personal holding company income, the royalties are also treated as personal holding company income, and Johnson is a personal holding company subject to such tax. Thus, its liability for such tax turns on whether the mineral payments are to be treated as rents or royalties within the meaning of section 543(a).

The Code, the regulations, and the legislative history do not clearly delineate the differences between rents and royalties. Section 543(b)(3) states that rent "means compensation, however designated, for the use of, or right to use, property." Section 1.543–1(b)(10), Income Tax Regs., defines rent:

Rents which are to be included as personal holding company income consist of compensation (however designated) for the use, or right to use, property of the corporation. * * *.

Section 1.543–12(e)(2), Income Tax Regs., defines royalties:

For purposes of determining personal holding company income, the term "mineral, oil, and gas royalties" means all royalties, including overriding royalties and, to the extent not treated as loans under section 636, mineral production payments, received from any interest in mineral, oil, or gas properties. * * *

See also sec. 1.543–1(b)(11), Income Tax Regs. Finally, when the provisions regarding rental income now contained in section 543 were first enacted, the House Ways and Means Committee report stated that "rents are defined as compensation, however designated, for the use of, or right to use, property" and that "'Rents' as here used is defined in its broadest sense and includes such items as charter fees, etc., and is not limited to rent of real property." H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 704, 708.

In applying the personal holding company provisions, as well as other provisions of the Code, the courts have been required, from time to time, to draw a distinction between rents and royalties. They have uniformly held that since the issue is one of interpreting a Federal statute, they are guided by the meaning intended by Congress and not by the definitions which might be

adopted by a State court in interpreting and applying the State law. *Commissioner v. Clarion Oil Co.*, 148 F.2d 671 (D.C. Cir. 1945), revg. on another issue 1 T.C. 751 (1943), cert. denied 325 U.S. 881 (1945); *Webster Corp. v. Commissioner*, 25 T.C. 55, 60–61 (1955), affd. per curiam 240 F.2d 164 (2d Cir. 1957); *Western Transmission Corp. v. Commissioner*, 18 T.C. 818, 822–823 (1952); see *Burnet v. Harmel*, 287 U.S. 103 (1932). In *Logan Coal & Timber Assn. v. Helvering*, 122 F.2d 848, 850 (3d Cir. 1941), affg. 42 B.T.A. 529 (1940), the Third Circuit said that the difference between rents and royalties for purposes of the personal holding company provisions is:

the commonly accepted one that rent is a compensation for the right to use property which is fixed and certain in amount and payable periodically over a fixed period regardless of the extent of the use of the property, while royalty is a compensation for the use of property which is based as to amount entirely upon the use actually made of the property. * * * [Fn. refs. omitted.]

There, the so-called lessor and lessee entered into a mineral lease which transferred possession of certain mining properties from the lessor to the lessee. Notwithstanding that the parties designated the payments under the lease as rents, the court held that such payments were royalties since they were measured by and dependent on the quantity of minerals extracted. Since then, on numerous occasions, the courts have adhered to the same basic distinction between rents and royalties. *Warren Browne, Inc. v. Commissioner*, 14 T.C. 1056, 1063 (1950); *U.S. Universal Joints Co. v. Commissioner*, 46 B.T.A. 111, 115–116 (1942); *Kiesau Petroleum Corp. v. Commissioner*, 42 B.T.A. 69, 75–77 (1940); see also *Anderson v. Helvering*, 310 U.S. 404, 409 (1940); *Bayou Verret Land Co. v. Commissioner*, 450 F.2d 850, 853–855 (5th Cir. 1971), affg. on this issue 52 T.C. 971 (1969); *Campbell v. Great National Life Insurance Co.*, 219 F.2d 693, 695–696 (5th Cir. 1955).

When we apply this standard to the mineral payments involved herein, there can be no doubt that such payments were royalties. The mineral payments were not fixed and certain in amount. To the contrary, such payments were tied directly to the use Boone made of the Semon farm. As the quantity of rock mined and sold by Boone increased, so did the payments from it to the petitioner.

The petitioner advances three arguments to support its conclusion that the mineral payments are rents. First, it argues

that State law rather than Federal law should be used to characterize such payments, and that under Missouri law, they were rents. However, it is clear that State law is only resorted to when it is necessary to determine if the petitioner has a legal interest in property and what are its rights with respect to such property. Once such interest is established under State law, the incidents of Federal tax which attach thereto are purely a matter of Federal tax law. As stated by the Supreme Court in *Burnet v. Harmel*, 287 U.S. at 110:

> Here we are concerned only with the meaning and application of a statute enacted by Congress, in the exercise of its plenary power under the Constitution, to tax income. The exertion of that power is not subject to state control. It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nationwide scheme of taxation. * * *

See *Aquilino v. United States*, 363 U.S. 509, 512–513 (1960); *Morgan v. Commissioner*, 309 U.S. 78, 80 (1940); *Palmer v. Bender*, 287 U.S. 551, 555 (1933). Since there is nothing in the personal holding company provisions to indicate that their application is dependent upon State law, since a well defined Federal policy with respect to passive income of corporations could be thwarted by resort to State law, and since the Federal tax cases establish a clear standard for differentiating rents from royalties, we deem Missouri law irrelevant in characterizing the payments from Boone to Johnson for purposes of the personal holding company tax.[3]

Second, the petitioner argues that the lease granted Boone the right to conduct a quarrying business on Semon farm, that the recompense for such rights was intended to be rent, that the parties so labeled the payments, and that therefore this Court should conclude the payments are rent. However, we find no merit in such argument. It is true that Boone acquired the right to possession of the Semon farm and to conduct its quarrying operations thereon, but those possessory rights were merely incidental to the quarrying and selling of the stone. See *Logan Coal & Timber Assn. v. Commissioner*, 42 B.T.A. at 537. The critical distinction is that Boone was primarily involved in

---

[3]The Commissioner disputes the petitioner's contention that under Missouri law, the mineral payments would be treated as rent, but in view of our conclusion that Federal law governs, we need not decide the question of Missouri law.

removing minerals from the ground for which it paid a fee which varied with the quantity of minerals removed and sold. Furthermore, it has long been established that the labels used by taxpayers do not control the incidents of their tax liability; rather, the substance of the transaction, not its form, is given effect for tax purposes. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Montgomery Coca-Cola Bottling Co. v. United States*, 208 Ct. Cl. 950 (1975). In addition, Johnson and Boone have not been consistent in the characterization of the payments. They referred to such payments interchangeably as royalties and rents in a protest filed with the IRS, and on their tax returns, they both referred to such payments as royalties.

Third, the petitioner argues that the lease with Boone is identical to many real estate leases in which the amount of the rent varies with the profits of the operation. Whether payments under participation leases not involving the removal of mineral, oil, gas, or other depletable resources, are to be characterized as rents or royalties is not before us. However, it is well settled that the payments are royalties when the participation depends upon the amount of minerals removed. In any event, the personal holding company provisions specifically single out mineral, oil, and gas royalties and segregate them from rents, and those provisions as interpreted by the courts compel our conclusion that such payments were royalties and that Johnson was a personal holding company for the years in issue.

The final issue for decision is whether, and to what extent, the petitioner is entitled to a deduction from its undistributed personal holding company income for payments of qualified indebtedness. The personal holding company tax is imposed on undistributed personal holding company income, as defined in section 545. Section 545(c) allows, in addition to other deductions, a deduction for amounts paid or set aside for the payment of qualified indebtedness, if the corporation was not a personal holding company for at least one of the two most recent taxable years ending before February 26, 1964, but if such corporation would have been a personal holding company for such year under the law which became applicable to taxable years beginning after 1963. The amount of the deduction, which would otherwise be allowable, is reduced by the deductions for depreciation and depletion and by net capital gains.

The parties agree that the indebtedness incurred by the

petitioner in 1958 and 1961 was qualified indebtedness, that the petitioner was a "would-have-been" corporation, and that the petitioner made payments on such indebtedness during the years in issue. The only dispute involves the extent to which the deduction for qualified indebtedness is reduced by the deductions allowed for depreciation and depletion and by net capital gains. In the notice of deficiency, the Commissioner included no deduction for payments of such indebtedness, but he has now submitted a computation under which he concedes that the petitioner is allowed $5,198.64 as such a deduction for 1966 but under which the petitioner is allowed no such deduction for the other years in issue. Our analysis of the Commissioner's computations reveals no errors, and the petitioner points us to no such errors. Accordingly, we sustain the Commissioner's computations.

*Decision will be entered under Rule 155.*