218 F.2d 486
 Frank SCOFIELD, United States Collector of Internal Revenue for the First District of Texas, Appellant,
v.
John E. DAVANT and Phil E. Davant, Independent Executors of the Estate of W.E. Davant, Deceased, et al.
 No. 15075.
 United States Court of Appeals, Fifth Circuit.
 January 12, 1955.
 
 I. Henry Kutz, Sp. Asst. to Atty. Gen., D. of J., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and David O. Walker, Sp. Assts. to Atty. Gen., Washington, D. C., Charles F. Herring, U. S. Atty., San Antonio, Tex., Bradford F. Miller, Asst. U.S. Atty., Seneca, Tex., for appellant.
 Homer L. Bruce, Thomas E. Berry, Houston Tex., Baker Botts, Andrews & Shepherd, Houston, Tex., of counsel, for appellees.
 Before HUTCHESON, Chief Judge, HOLMES, Circuit Judge, and ALLRED, District Judge.
 HOLMES, Circuit Judge.
 
 
 1
 This appeal is from a judgment of the court below, holding that the appellees were entitled to a refund of income taxes for the taxable year 1945. The single question is whether the district court erred in finding that a valid and bona fide partnership existed between the taxpayers, their children, and relatives.
 
 
 2
 Many years prior to 1941, L. D. Clements, R. Q. Pegram, and W. E. Davant, three of the taxpayers, organized the South Texas Water Company to develop and operate an irrigation system to supple water from the Brazos River for the production of rice near Rosharon, Texas. The water company leased a great deal of land in this vicinity. The same parties organized the South Texas Rice Production Company, which subleased the lands from the water company. The production company then proceeded to arrange with farmers to cultivate the various tracts of land, which belonged to absentee owners; the production company was to furnish the seed rice, the land and water, and to pay half the cost of fertilizing and poisoning. The proceeds of the rice crop would be divided, one-half going to the farmers and one-half to the production company. These operations would cover from 20,000 to 30,000 acres each year, which was rented by the water company from said absentee owners, and subleased by the production company.
 
 
 3
 By 1940, the stock of the two companies was owned in equal proportions by W. E. Davant, S. M. Clements, L. D. Clements, R. Q. Pegram, and M. O. Savage. In 1941, the South Texas Rice Production Company was dissolved. The five stockholders took over its assets; executed a partnership agreement among themselves under the name of South Texas Rice Farms, each partner owning a one-fifth interest; and continued the same line of business, formerly carried on by the South Texas Rice Production Company, in substantially the same way.
 
 
 4
 Starting in the fall of 1943, the partners had many discussions among themselves about giving part of their interests in the partnership to their children and other relatives. It was finally decided that the transfer should actually be, and take the form of, a sale rather than a gift. On March 1, 1944, the partners in South Texas Rice Farms sold a part of their interest to their relatives, consisting of eight children, a sister of one of the partners, and the sister-in-law of another partner. The value of the partnership interests, which were sold and conveyed, was determined on the basis of the net worth of the partnership. The purchasers paid for their interests by giving notes to the selling partners, which were to be paid from the profits of the partnership business. Each purchaser, at the time of the sale, executed and delivered a universal power of attorney to the selling party. Each note provided that it was secured by the particular undivided interest in the partnership, which was pledged to secure the payment of the note, and recited that, as further security, each purchaser had executed a power of attorney, which was to be irrevocable as long as the note was unpaid, and that the holder of the note should have the right to receive all earnings, due to the maker from the partnership, to be applied in payment of the note.
 
 
 5
 The partnership each year would require $150,000 to $250,000 in cash to pay its operating expenses, substantially all of which would be incurred prior to the middle of July. Near the close of the year, the five original partners would have a conference in reference to the amount of funds that should be distributed to the partners. After considering the amounts on hand and the amounts that were needed for expenses during the year, they would distribute any excess cash to the partners. Payments on the notes were made at different dates ranging from July, 1947, to March, 1948, the aggregate of which amounts paid the notes in full. All distributions by the partnership have been made to old and new partners in accordance with their original and supplementary partnership agreements. A total of $2,910,000 was distributed as profits to the members of the new partnership.
 
 
 6
 The Commissioner, in the taxable income of the original five partners for 1945, included all of the taxable income of the partnership, excluding it from the income of the new partners; and additional taxes so assessed were paid. Claims for refund were timely filed, and the five taxpayers instituted this action. The trial court concluded that the sales of the partnership interests were valid and bona fide; that the parties in good faith intended to and did join together as partners for the purpose of carrying on its business and sharing its profits and losses; and that the Commissioner erred in including the distributive shares of the children and relatives in the income of the original partners and their wives. The Commissioner argues that the income of the partnership was earned by the five original partners, not by the relatives, who did not furnish either capital or services. Although the Commissioner does not urge that the partnership was a sham or a fraud, he contends that a real partnership did not exist.
 
 
 7
 The evidence of appellees is undisputed. All of the taxpayers' witnesses testified that the new partners performed no services, and had nothing to do with the operation of the business; that the business needed no additional capital, and received none, but that the new partners bought an interest in the assets of the old firm; that the interests transferred were to be paid for only out of the profits; that the transferees had no other income from which to pay for their shares; and that each of the new partners gave a note to pay his transferor, coupled with a universal power of attorney, which was irrevocable so long as the note remained unpaid. The evidence further showed that there was a written partnership agreement; that all distributions of income were made to the partners in accordance with their partnership interests; that each partner had control over his distributions; and that none of the selling partners ever received any benefits from any of the distributions made by the partnership to the transferees except to the extent that part of the proceeds was applied in payment of the notes.
 
 
 8
 This court has stated numerous times that the ultimate question for decision is the reality vel non of the partnership for tax purposes. This in turn depends upon whether the partners really and truly intended to join together for the purpose of carrying on a business and sharing in the profits or losses or both. Their intention in this regard is a question of fact, to be determined from the evidence, including their partnership agreement considered as a whole, and their conduct in the execution of its provisions.
 
 
 9
 There is no evidence to controvert the fact that the partners did in good faith intend to enter into the partnership. It is obvious from the undisputed facts that all of the parties regarded the children and relatives as the true owners of the property conveyed to them. This was not a mere temporary reallocation of income within the family group; nor did the income continue to be used for the same business and family purpose as before the formation of the partnership. There was a real change in the economic relations of the original partners and the new partners with respect to the income. The conclusion is inescapable that the partnership agreement was not a subterfuge, but, on the contrary, was made in good faith. Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659; Ginsburg v. Arnold, 5 Cir., 185 F.2d 913; Arnold v. Green, Commissioner, 5 Cir., 186 F.2d 18; Batman v. Commissioner, 5 Cir., 189 F.2d 107; Alexander v. Commissioner, 5 Cir., 194 F.2d 921; Seabrook v. Commissioner, 5 Cir., 196 F.2d 322; Tomlinson v. Commissioner, 5 Cir., 199 F.2d 674; Turner v. Commissioner, 5 Cir., 199 F.2d 913; Marcus v. Commissioner, 5 Cir., 201 F.2d 850; West v. Commissioner, 5 Cir., 214 F.2d 300.
 
 
 10
 It is no longer essential for tax purposes that a partner contribute to the partnership either vital services or capital originating with him. It is necessary for a partner to contribute capital or services or something of substantial value, but it makes no difference where the capital originated if it was legally acquired and actually contributed to the business of the firm. The fact that it is gift capital is immaterial if it was a genuine contribution to the partnership and an income producing factor, though the family relationship may call for careful scrutiny as to whether the gift was genuine and irrevocable. A real and genuine partnership agreement, which is not a sham or fraud and is valid under the law of the state where the firm's business is being conducted, is valid for tax purposes if the partner in question is in part materially responsible for the production of income during the tax year. It may be merely the lending of one's name to the credit of the firm. Where fair and reasonable minds may differ as to whether the thing furnished was of sufficient substantial value to justify the admission of any partner, the court may not substitute its judgment for that of the contracting parties. Estate of Dorsey v. Commissioner, 5 Cir., 214 F.2d 294.
 
 
 11
 Compare the marital partnership of acquets and gains under the Louisiana Civil Code, which has long been upheld by the federal courts for income tax purposes, and wherein the partners in most cases furnish little or no capital. The common law is not less potent for income tax purposes than the civil law in respect of governing the rights and legal relations of partners in business or marriage. The Congress may legislate to some extent in this field, under the Sixteenth Amendment, but the courts may not; and for the courts to usurp that which is not given "would be treason to the Constitution." Chief Justice Marshall, in Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 404, 19 U.S. 264, 404, 5 L.Ed. 257.
 
 
 12
 The judgment appealed from is affirmed.
 
 
 13
 Affirmed.