BAYOU VERRET LAND CO., Inc., et al.,
Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Carlos and Jacqueline MARCELLO et al.,
Petitioners-Cross-Respondents,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Cross-Petitioner.

No. 30347.

United States Court of Appeals,
Fifth Circuit.

Nov. 2, 1971.

Rehearing Denied Jan. 3, 1972.

**852**

deQuincy V. Sutton, Meridian, Miss., Thomas J. Taylor, New Orleans, La., for petitioners.

Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., U. S. Dept. of Justice, K. Martin Worthy, Chief Counsel, Eugene F. Colella, Atty., I. R. S., John M. Brant, Carleton D. Powell, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before GOLDBERG, GODBOLD and RONEY, Circuit Judges.

GODBOLD, Circuit Judge:

Consolidated for review in this court are five appeals from similarly consolidated decisions of the Tax Court on petitions to redetermine the Commissioner's assessments of deficiencies in the tax liabilities of a number of related Louisiana taxpayers.[1] We affirm in part and reverse and remand in part.

## I. *Bayou Verret and Churchill Farms*

During 1959–64 Bayou Verret Land Co., Inc., and Churchill Farms, Inc., derived their income almost solely from oil and gas leases covering portions of Louisiana land owned by them, approximately 1271 acres and 4200 acres, respectively. After an audit, the Commissioner determined that there were deficiencies in the corporations' income tax, and that both were personal holding companies within the meaning of and subject to the tax imposed by IRC §§ 541–547, 26 U.S.C. §§ 541–547,[2] for

---

1. The appealing taxpayers are Bayou Verret Land Co., Inc., *see* 52 T.C. 971 (1969), and Churchill Farms, Inc., *see* 28 CCH Tax Ct.Mem. 968 (1969); Rosario and Julia Occhipinti, *see* 28 CCH Tax Ct.Mem. 979 (1969); and Carlos and Jacqueline Marcello, *see* 28 CCH Tax Ct.Mem. 1011 (1969).

2. Prior to their amendment in 1964, the personal holding company provisions of the Internal Revenue Code in relevant part provided:

"Sec. 542. *Definition of a personal holding company.*

"(a) *General rule.*—For purposes of this subtitle, the term 'personal holding company' means any corporation (other than a corporation described in subsection (c)) if—

(1) *Gross income requirement.*—At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and

(2) *Stock ownership requirement.*—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * * *"

* * * * *

"Sec. 543. *Personal holding company income.*

"(a) *General rule.*—For purposes of this subtitle, the term 'personal holding company income' means the portion of the gross income which consists of:

* * * * *

"(7) *Rents.*—Rents, unless constituting 50 percent or more of gross income. * * *

1959–64. On petition, the Tax Court overruled these determinations with respect to some years but agreed that Bayou was a personal holding company in 1959, 1960 and 1963, and that Churchill was a personal holding company in 1959 and 1960. Bayou Verret Land Co., Inc., v. Commissioner of Internal Revenue, 52 T.C. 971 (1969).

(A) Personal holding company issues.

On appeal both corporations contend that the Tax Court erred in holding them subject to the personal holding company tax. Primarily they assert that income received from various oil and gas leases was not "personal holding company income" as defined by § 543(a) (8).

The limited number of shareholders and the absence of dividends [3] prerequisite to the imposition of the tax were undisputed below. The lease income consisted solely of "lease bonus" or advance lump sums which the corporations as lessors received on the execution of various oil leases subsequently abandoned without production. It was also not in dispute that for each corporation this income exceeded 50 percent of its gross income. Thus whether each was subject to the personal holding company tax depended upon whether the lease bonus was considered to be "rent," governed by pre-1964 § 543(a) (7), or "mineral, oil, or gas royalty," governed by pre-1964 § 543(a) (8). If it were considered rent, the corporations would escape imposition of the tax since their income from the leases constituted more than 50 percent of gross income. IRC § 543(a) (7). But if it were considered mineral, oil, or gas royalty, the corporations could escape imposition of the tax

only if, in addition, their allowable deductions under IRC § 162 exceeded 15 percent of gross income for each of the years in question. IRC § 543(a) (8) (B).

Overruling its earlier decision in Porter Property Trustees, Ltd., 42 B.T.A. 681, 691 (1940), and following the decision in Commissioner of Internal Revenue v. Clarion Oil Co., 80 U.S.App.D.C. 41, 148 F.2d 671 (1945), the Tax Court ruled in favor of the Commissioner and held the bonuses to be mineral royalties, even though the leases in respect of which the bonuses were received were subsequently abandoned without production. Both *Clarion Oil* and the court below proceeded by analogy to decisions holding lease bonus subject to the same tax treatment as production royalties, e. g., Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932), including the allowance for depletion, e. g., Murphy Oil Co. v. Burnet, 287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318 (1932); Palmer v. Bender, 287 U.S. 551, 559, 53 S.Ct. 225, 77 L.Ed. 489, 494 (1933), even where no production had occurred in the year in which the bonus was received and the deduction for depletion taken, Herring v. Commissioner of Internal Revenue, 293 U.S. 322, 55 S.Ct. 179, 79 L.Ed. 389 (1934). Relying on the fact that these decisions antedated the enactment of the scheme of taxation of personal holding companies in 1934, Revenue Act of 1934, 48 Stat. 680, 751–752, both *Clarion Oil* and the Tax Court in the present litigation reasoned that when Congress employed the term "royalties" in the 1934 statute, and "mineral, oil, or gas royalties" in the 1937 revision, Revenue Act of 1937, 50 Stat. 813, it intended the term to include lease bo-

---

(8) *Mineral, oil, or gas royalties.*— Mineral, oil, or gas royalties, unless—

(A) such royalties constitute 50 percent or more of the gross income, and

(B) the deductions allowable under section 162 (relating to trade or business expenses) other than compensation for personal services rendered by the shareholders, constitute 15 percent or more of the gross income."

These provisions were extensively amended in 1963 for taxable years commencing after December 31, 1963. Since the Tax Court overruled the Commissioner's personal holding company determinations with respect to 1964, no issues are raised on this appeal under the post-1963 provisions.

3. Pre-1964 IRC § 561.

nus, in accordance with prior Supreme Court construction of the income tax laws. *Clarion Oil, supra*, 148 F.2d at 674; 52 T.C. at 979. In both decisions this conclusion was reached despite the fact that the leases had been condemned and abandoned without production.

This argument has merit, but we do not think it conclusive, particularly because, although the Supreme Court has held that lease bonuses are regarded as advance royalties, and are given the same tax consequences, Anderson v. Helvering, 310 U.S. 404, 409, 60 S.Ct. 952, 84 L.Ed. 1277, 1281 (1940), it has not held that they are royalties, and indeed, cash bonus payments are sometimes given different tax treatment. In particular, when land subject to an oil lease, on which a cash bonus has been previously paid, is condemned without any actual production, the previously deducted depletion is by the Commissioner's regulations required to be restored to income in the year of condemnation, Treas.Reg. 1.612–3(a) (2). The Supreme Court has upheld this regulation, Douglas v. Commissioner of Internal Revenue, 322 U.S. 275, 64 S.Ct. 988, 88 L.Ed. 1271 (1944). Thus, it does not follow, from the fact that bonus payments are in some instances treated for income tax purposes like production royalties, that "mineral, oil, or gas royalties" as used in pre-1964 § 543(a) (8), necessarily includes lease bonus.

Nevertheless, we are persuaded that lease bonus should be treated as oil or gas royalty within the meaning of § 543(a) (8), and that the Tax Court's ultimate ruling must stand. It is the statute itself which draws us to this conclusion. The problem to which the personal holding company tax is directed is the accumulation of passive investment income in closely held nonoperating companies, a device employed by high tax-bracket individuals to shield their income from the high graduated individual tax rates while exposing it only to the lower flat rate corporate income tax. The scheme of personal holding company taxation was enacted when Congressional studies revealed that the accumulated earnings tax of IRC § 531 was inadequate to police such abuses. Bittker § Eustice, Federal Income Taxation of Corporations and Shareholders, § 6.20 (2d ed. 1966). Since the original enactment of the statute in 1934, "royalties" have been included as one of the categories of personal holding company income, Revenue Act of 1934, § 351, and since 1937 both "mineral, oil, and gas royalties," and "rents" have been denominated potential personal holding company income,[4] Revenue Act of 1937, § 1. Because it seems to us that the type of lease bonus here under consideration is precisely the sort of passive investment income with which the statute is concerned[5]—indeed, since the term "lease bonus" semantically appears to straddle the statutory categories of "mineral, oil or gas royalties" and "rent"—we have no doubt that the lease bonus falls within one category or another.[6] The question is which one.[7]

We conclude that it is more agreeable to the statutory scheme for lease bonus to be classified as "mineral, oil, or gas royalty." As we have noted,[8] the primary difference between the pre-1964

---

4. Assuming, of course, that the various other percentage requirements of the statute are met.

5. The statute is directed at, *inter alia*, "mineral, oil, and gas *royalties*," while income from working interests in oil and gas properties is not subject to the personal holding company tax, *see* Bittker & Eustice, *supra* at § 6.22.2.

6. In the court below taxpayers contended that the lease bonus was "rent," 52 T.C. at 977 n. 4; 28 CCH Tax Ct.Mem. at

1009 & n. 14, but in this court they appear to contend only that the sums were not "royalty."

7. Taxpayers urged on oral argument that because the tax was penal in nature we should construe it as narrowly as possible. This argument is beside the point in view of our conclusion that the lease bonus is either rent or royalty, and in either case personal holding income.

8. *See* n. 2 and text following n. 3, *supra*.

treatment of rents and oil or gas royalties as personal holding company income is that the former were not considered such income if they exceeded 50 percent of gross income, while in the latter case there was the additional requirement that the corporation's § 162 deductions exceed 15 percent of gross income. "The 15 percent business expense test is designed to separate operating companies from holding companies by demanding a minimum level of business activity * * *." Bittker & Eustice, *supra*, § 6.22.3. In other words, this requirement distinguishes corporations whose principal, if not sole, income generating assets consist of profitable mineral leases, from companies which, in addition, actually carry on substantial operating activities.[9]

It appears to us that § 543(a) (7), governing rents, contains no 15 percent business deduction requirement because the corporation receiving substantial income from actual rentals on property will frequently be the owner of developed land, undergoing the normal expenses of maintaining and operating its income producing assets. Thus, there often are likely to be inherent safeguards that such corporations are at least pro forma operating companies. This is not as likely with the corporation whose income is from oil leases covering property which is typically otherwise undeveloped, to say nothing of corporations which have acquired leases by assignment and do not even own the lands subject to the leases.

As is the case with corporations receiving income from oil production royalties, and unlike real estate operating companies, there are no inherent safeguards that corporations such as Bayou and Churchill, which receive most of their income in the form of lease bonus, are genuine operating companies rather than holding companies. Accordingly, we conclude that it would conform to the purposes of the statutory scheme for the lease bonus income received by these corporations to be classified as mineral, oil, or gas royalty, rather than rent. Placing such bonuses in the former category subjects the income to the statutory 15 percent business deduction requirement of § 543(a) (8) (B),[10] thereby providing some modest assurance that the corporations are in fact operating companies. And, since the function of the 15 percent requirement in no way depends upon whether the leases from which the bonuses were received become productive, we think this conclusion follows regardless of whether actual production occurs.

Our conclusion is reached with respect to a hybrid category of income not expressly provided for in the statute, which, as a matter of semantics is not clearly either rent or royalty, and as to which the legislative history of the statute is unrevealing. We do not hold that all income received from mineral properties is royalty rather than rent, and in particular we do not deal with "delay rentals," which are normally treated as personal holding company rents. *See* I. T. 3401, 1940–2 Cum.Bull. 166.

Taxpayers also contend that even if lease bonus is generally considered to be pre-1964 personal holding company mineral, oil, or gas royalty, their 1959 income which was from advance payments on "shooting and selection" leases,[11] was erroneously found by

---

9. As we noted above, *see* n. 5, *supra*, personal holding company income includes mineral royalties, but does not include income from working interests in mineral properties.

10. Carried forward in the present statute as § 543(a) (3) (C). Whether the same conclusion should obtain in construing the 1964 revision depends on the impact of the amendments, and we do not discuss the question.

11. A "shooting and selection lease," or "shooting option," grants the lessee the right to conduct geophysical explorations for oil on the land and, in addition, the subsequent right to select and lease certain acreage on which to conduct actual drilling operations. Williams & Meyers, Manual of Oil and Gas Terms 7, 368–69 (1964).

the Tax Court to be lease bonus. We are unable to say that the court erred. Whether such income is received "for mere delay[12] * * * is best ascertained from the agreement of the parties," Houston Farms Dev. Co. v. United States, 131 F.2d 577, 579 (5th Cir. 1942), rehearing denied, 132 F.2d 861 (1943). Nevertheless, taxpayers introduced none of the 1959 leases in evidence.[13] Nor did they introduce any independent evidence that any sums were received under the provisions for delay rentals. Finally, as an evidentiary matter, the Tax Court took cognizance of the fact that in their 1959 income tax returns taxpayers treated these sums as lease bonuses and deducted therefore the 27½ percent allowance for depletion. The Tax Court's holding that the advance lump sums received on the execution of the shooting and selection leases should be treated as lease bonus was not clearly erroneous.

■ The remaining issue with respect to the treatment of income for personal holding company purposes concerns whether, in view of its decision in Seth Campbell, 41 T.C. 91, 94 (1963), the Tax Court correctly treated as lease bonus sums received by Bayou in 1963 on account of a lease which was abandoned without production in the year of execution. *Seth Campbell* was a depletion case and relied upon the Supreme Court decisions dealing with the tax treatment for depletion purposes of lease bonus. As we have said earlier, our conclusion with regard to the personal holding company treatment of lease bonus is grounded not on the depletion decisions but rather on a construction of the personal holding company tax provisions themselves. The considerations which lead us to conclude that lease bonus is to be treated as personal holding company mineral, oil or gas royalty, unlike the considerations governing the depletion of lease bonus, apply regardless of whether the lease is condemned without production in the year of execution or in any other year. Accordingly, taxpayer's contention is without merit.

### (B) Deduction issues.

■ Bayou contends that the Tax Court erred in finding that interest which it paid on two loans in 1963 was, although deductible under § 163, not deductible under § 162 as an "ordinary and necessary" business expense. The result of this finding was that the interest was not included in determining whether, in 1963, Bayou's § 162 deductions exceeded 15 percent of its gross income. IRS § 543(a) (8) (B). In 1961 Bayou was negotiating for the purchase of adjoining lands, and it claims that as an incident of the proposed purchase it entered into a commitment with a lending institution to borrow $85,000. In 1962, after the purchase negotiations had been terminated without agreement, Bayou consummated with the lending institution two loans for $85,000 and promptly distributed the proceeds to some of its shareholders in return for their personal notes.[14] The Tax Court concluded that the interest on the notes paid by Bayou to the lender was not an expense "necessary" to the conduct of Bayou's business and therefore did not qualify as a § 162 deduction. Whether the money was borrowed and the interest thereon paid "to serve a business purpose, or merely to effectuate personal, non-business purposes, was a fact question for the determination of the Tax Court." W. D. Haden Co. v. Commissioner of Internal Revenue, 321 F.2d 169, 173 (5th Cir. 1963). The court's finding was not clearly erroneous.

12. *I. e.*, "delay rentals," a subject on which, as to personal holding company treatment, we intimate no opinion.

13. The one shooting and selection lease in evidence was for 1961, and the taxpayers say is "exemplary" of the 1959 leases, but there is an absence of proof that the other leases were similar. Moreover, to the extent it might be relevant, this lease expressly denominates the advance sums received as "bonus."

14. The personal notes did not aggregate the full amount of the disbursements from the corporation to the makers.

With respect to the same transaction, the Tax Court, in a consolidated case,[15] held that the portion of the borrowed funds which Bayou distributed to Carlos Marcello, a Bayou shareholder, should be taxed to Marcello as dividends for the year 1962, notwithstanding that the corporation and shareholders treated the disbursements as debts. The determination "[w]hether or not a corporate distribution is a dividend or something else * * * presents a question of fact * * *." Lengsfield v. Commissioner of Internal Revenue, 241 F.2d 508, 510 (5th Cir. 1957). In particular, where disbursements are contended to have been loans, whether they were loans or dividends depends upon whether, at the time the disbursements were made, petitioners intended to repay them; and intent to repay or to retain is a question of fact, to be determined upon a consideration of all the circumstances in each case. Chism's Estate v. Commissioner of Internal Revenue, 322 F.2d 956, 960 (9th Cir. 1963). The notes evidencing the purported debts were demand instruments containing no schedule for repayments, see Gurtman v. United States, 237 F.Supp. 533, 536 (D. N.J.), aff'd per curiam, 353 F.2d 212 (3d Cir. 1965), and, as noted above, the aggregate value of the instruments themselves did not equal the amount of the disbursements, with the result that some of the debts were not evidenced by any instrument at all. See Chism's Estate v. Commissioner of Internal Revenue, supra. Moreover, taxpayers took the position that the loans to the shareholders were for the purpose of minimizing Bayou's interest costs on the funds which it allegedly was obliged to borrow from the New Orleans lender. However, the shareholders made only nominal repayments in 1962, none in 1963–64, and only partial repayments in 1965–66; Marcello never paid Bayou any interest on the loans, see Chism's Estate, supra;

and, when in 1966 Bayou was in a position to "minimize its interest costs" by calling the loans from its shareholders and repaying its own obligations, it instead chose to extend its own obligations. Against this background the Tax Court concluded that business motivation for the shareholder loans was nonexistent. Notwithstanding that the transactions with the shareholders were cast as loans, it also found an "informality inconsistent with an intention to create an enforceable debt," 28 CCH Tax Ct. Mem. at 1020, inferred that the distributions were intended from the outset to be permanent, and concluded they were taxable as such. This inference was permissible, as would have been the contrary one. The Tax Court's finding was not clearly erroneous. The fact that Marcello actually repaid part of the distribution does not foreclose this conclusion. Most of the repayments were made after the Commissioner's notice of deficiency for the tax year 1963 had been issued, and all but a fraction of the remainder was repaid in the previous year, at a time when, the Tax Court concluded, Marcello was aware of the Commissioner's audit. The Tax Court found these repayments were mere "window dressing." Such belated, protective repayments do not insulate distributions originally intended to be permanent from being taxed as such. See Gurtman v. United States, supra, 237 F.Supp. at 536; Regensburg v. Commissioner of Internal Revenue, 144 F.2d 41, 44 (2d Cir.), cert. denied, 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625 (1944); W. T. Wilson, 10 T.C. 251, 256 (1948).

The last of the Bayou-Churchill issues involves the Tax Court's disallowance of deductions for certain expenditures incurred by Churchill in 1960–61.[16] For 1960 the expenditures in question are for: construction work on structures on Churchill's land; sand and

---

15. Carlos Marcello, 28 CCH Tax Ct.Mem. 1011, 1019–21 (1969).

16. These are primarily income tax issues but, since Churchill was held to be a personal holding company in 1960, the conclusions here might affect its liability under the latter statute as well.

shells used to repair an access road to Churchill's land, which the Tax Court found was impassable in places prior to the repairs; the placement of section markers pursuant to a survey conducted in connection with the leasing of taxpayer's land; and rental of a marsh buggy. For 1961, they are for the reconstruction and seeding of a perimeter levee which the record reveals was 50–78 percent below water prior to the repair, and uniform in height and topped with an all-weather road after the work. The Tax Court found that prior to the time the Marcello group of taxpayers acquired Churchill in 1960, the access road, structures and wharves on Churchill's land, and the perimeter levee, had been permitted to deteriorate and had become unusable. It concluded that since the expenditures were not normal, routine maintenance, but rather substantial rehabilitation, which in most cases prolonged the useful life of the structures, they were required to be capitalized. Taxpayer appears to contend that because the expenses were "necessary," they were deductible. But, assuming that they were necessary, they were required to be "ordinary" as well. "The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 689–690, 86 S.Ct. 1118, 1120, 16 L.Ed.2d 185, 188 (1966). Under familiar principles, Treas.Regs. §§ 1.162–4, 1.263(a)–1 (1960); Jones v. Commissioner of Internal Revenue, 242 F.2d 616 (5th Cir. 1957); Stoeltzing v. Commissioner of Internal Revenue, 266 F.2d 374 (3rd Cir. 1959); 4A Mertens, Law of Federal Income Taxation, § 25.20 (1966 rev.), the Tax Court found that these expenditures were extraordinary and hence capital in nature. We are unable to say that the findings are clearly erroneous or the ultimate conclusion incorrect. As to the

expenditures for section markers which were part of a larger expenditure for survey work, the Tax Court concluded that the benefits from the markers would extend beyond the year in which they were made. Such expenditures are normally treated as capital in nature. Louisiana Land & Exploration Co., 7 T. C. 507, 514–516 (1946), aff'd, 161 F.2d 842 (5th Cir. 1947). The other survey expenses had been allowed as deductions, and the Tax Court was required to estimate the portion of the overall survey expense attributable to the placement of the section markers. Taxpayer complains that the Tax Court proceeded by estimation, but its conduct was wholly proper. See Cohan v. Commissioner of Internal Revenue, 39 F.2d 540, 543–544 (CCA 2, 1940); Cummings v. Commissioner of Internal Revenue, 410 F.2d 675, 678 & n. 11 (5th Cir. 1969). The record lacks sufficient probative evidence to permit the conclusion that the swamp buggy was used in connection with routine operations rather than work capital in nature. Taxpayer therefore failed to overcome the presumption of correctness attaching to the Commissioner's determination that it was used in connection with capital outlays. See, e. g., Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212, 215 (1933); Armes v. Commissioner of Internal Revenue, 448 F.2d 972 (5th Cir. 1971).

■ Churchill contends that the Tax Court established arbitrarily protracted periods for depreciation of some of the capitalized expenditures. The court did not reach the merits of this contention, and neither do we. The record contains no evidence as to depreciation except for an oral stipulation to a 20 year life which the Tax Court took to apply to all of the Churchill facilities. 28 CCH Tax Ct. Mem. at 1006. Almost six months after the decision was entered, the taxpayer moved to modify the opinion so as to limit the stipulation to some buildings and to judicially notice a shorter life span of other assets. The motion was properly denied as untimely filed, Rule

19(e) of the Tax Court's Rules of Practice, 26 U.S.C. following § 8032 (1964), 26 U.S.C.A. following § 7453, Miller v. Commissioner of Internal Revenue, 237 F.2d 830, 834 & n. 1 (5th Cir. 1956), and on this appeal we need not consider the matters raised therein.

## II. *Jacqueline, Inc., Motor Hotels of Louisiana, Inc. issues*

These issues involve the personal income tax liabilities of Carlos Marcello, Rosario Occhipinti, and his brother, Frank Occhipinti,[17] arising out of transactions between the individuals and various corporations in which they had substantial interests and of which in some instances they were officers. Jacqueline, Inc. was formed for the purpose of acquiring and holding Holiday Inn franchises and related capital assets, and Motor Hotels of Louisiana, Inc. was formed as an operating company to manage the motels.

Jacqueline was organized in 1958, and its articles of incorporation recite paid-in capital of $400,000, consisting of 4000 shares of $100 par value stock. Jacqueline was interested in acquiring the Holiday Inn West in New Orleans, for which the sellers required $400,000 cash as part of the purchase price. Since Jacqueline possessed only $300,000 of the recited paid-in capital in cash, the deficiency of $100,000 was supplied by a note, signed by Rosario and Marcello as makers and accepted by the sellers in payment of the additional cash needed. The note was immediately discounted at a New Orleans bank, and during the next three years Jacqueline discharged the two individuals' liability on the note by paying the installments thereon. The Tax Court found Jacqueline's discharge of Marcello's and Rosario's liability to be constructive dividends, taxable in part to each to the extent of the corporation's earnings and profits. IRC §§ 301, 316.

There was conflicting evidence regarding whether Jacqueline's original capitalization was in fact $400,000, of which Marcello, Frank and Rosario personally owned 3,000 shares, as found by the Tax Court, or whether, as taxpayers contended, it was $300,000, of which 2,000 shares were owned by Town & Country Motels, a partnership consisting of Marcello, Rosario, Frank and others. We reject the threshold contention that the Tax Court's findings were clearly erroneous.

Taxpayers correctly state that the test for the existence of a constructive dividend is whether "the corporation conferred an economic benefit on the stockholder without the expectation of repayment," Gibbs v. Tomlinson, 362 F.2d 394, 397 (5th Cir. 1966); *e. g.,* United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969); Sullivan v. United States, 363 F.2d 724, 728 (8th Cir. 1966); Sachs v. Commissioner of Internal Revenue, 277 F.2d 879, 882–883 (8th Cir. 1960). Relying particularly on Easson v. Commissioner of Internal Revenue, 294 F.2d 653 (9th Cir. 1961), they claim that Jacqueline conferred no economic benefit upon them in discharging their obligation on the note. Their reliance on *Easson* is misplaced. There an individual taxpayer transferred to a wholly owned corporation real property subject to a mortgage on which the individual was personally liable. The corporation assumed the taxpayer's liability and paid the mortgage installments as they fell due. The court rejected the Commissioner's contention that the corporation's payment of the mortgage, on which the individual taxpayer remained personally liable, constituted a constructive dividend. It reasoned that as the corporation paid off the mortgage its net worth remained constant because the outflow of cash was balanced by an increase in the value of its equity in the property subject to the mortgage, and

---

17. Hereafter referred to as Marcello, Rosario, and Frank, respectively. Each taxpayer's wife is a party either by virtue of the Louisiana community property law or by virtue of having filed joint returns for the years in controversy.

that, therefore, it did not distribute any assets to the individual. 294 F.2d at 661. Contrariwise, Jacqueline did not hold the acquired property subject to the note; rather, the net value of Marcello and Rosario's stock in Jacqueline was, although not technically subject to the note, diminished in value thereby. Accordingly, as Jacqueline paid off the note its net worth declined [18] while Marcello's and Rosario's increased. This conferred an economic benefit upon Marcello and Rosario. The Tax Court correctly concluded that a constructive dividend had been paid.

During 1959 taxpayers successfully acquired the LeBaron corporation, which was then in receivership. Of the down payment of $69,000 in cash, $39,000 was assembled in the following manner: Motor Hotels issued checks aggregating $29,250, and Jacqueline issued a check in the amount of $9,750 to Frank, who exchanged the checks for a $39,000 cashier's check which, along with a cashier's check for the balance supplied by another individual, was deposited with the LeBaron receiver. These disbursements were charged to accounts labelled "Due from officers—Frank Occhipinti," on the books of the respective corporations. LeBaron was acquired and its real property ultimately vested in Jacqueline and was operated by Motor Hotels. Subsequently the "Due from Officers" account was credited, and a debit was entered under "Due from LeBaron" on the books of both corporations.

The Tax Court rejected Frank's contention that these disbursements were loans as purported, and concluded that Frank never intended to repay them, with the result that they should be taxed to Frank as dividends to the extent of the earnings and profits of Motor Hotels and Jacqueline, respectively. In this court Frank claims that the loans actually were made to LeBaron Corporation, so that his lack of intent to repay them was irrelevant. In addition, he contends that if taxable as corporate distributions they should be taxed in part to the other stockholders of Motor Hotels and Jacqueline, on the theory that Frank was acting for this group in the LeBaron dealings.

Taxpayer's contentions must be rejected. The Tax Court's finding that the loans were made to Frank rather than to LeBaron, as Frank now contends, is not clearly erroneous, particularly in view of the long delay between the time the checks were issued and the time they were set up on the books of Motor Hotels and Jacqueline as due from LeBaron. The conclusion that Frank never intended to repay these sums is virtually conceded on appeal.[19] As to the alternative contention that, if the disbursements are taxed as corporate distributions they should be taxed to the shareholders of Jacqueline and Motor Hotels pro rata rather than to Frank alone, we think the Tax Court's determination is adequately supported by the facts that the checks were issued to him, that the corporations initially treated the disbursements as due from him alone, and that other shareholders supplied funds for the acquisition from their own sources.

18. The record reflects that while the note was being discharged, Jacqueline reduced its capitalization by cancelling some outstanding shares. Since there was no evidence to establish a causal connection between the reduction in outstanding shares and payment of the $100,000 note, it cannot be considered a compensating increase in assets analogous to the increase in the corporation's equity in *Easson.*

19. The fact that LeBaron purportedly assumed these obligations does not make erroneous the conclusion that the disbursements did not rise to the level of genuine debts enforceable by Jacqueline and Motor Hotels against somebody. There was no showing that after the purported assumption they were treated by Jacqueline, Motor Hotels, and LeBaron as genuine debts enforceable against LeBaron. We express no opinion on the tax consequences in such circumstances.

■ In addition to the LeBaron checks, the Commissioner treated certain sums which Motor Hotels distributed to Frank and Rosario as corporate distributions, taxable as dividends to the extent of Motor Hotels' earnings and profits. Some of the distributions were evidenced by checks issued to and/or endorsed by the distributee and journal entries reflecting the disbursements as debts due from the distributee, while others were only evidenced by journal entries. The Commissioner's determination that the journal entries, *see* Rogers v. Commissioner of Internal Revenue, 111 F.2d 987 (CCA 6th 1940), and the checks, reflected income taxable to Frank and Rosario respectively was presumptively correct, *e. g.*, Welch v. Helvering, *supra;* Cummings v. Commissioner of Internal Revenue, *supra;* Armes v. Commissioner of Internal Revenue, *supra.* The only evidence to establish that these disbursements were not taxable income consisted of taxpayers' testimony, and this the Tax Court was entitled to reject, particularly in view of its evasiveness and generality. Armes v. Commissioner of Internal Revenue, *supra,* 448 F.2d at 973. The Tax Court's finding that taxpayers failed to disprove the Commissioner's determination was not clearly erroneous.

### III. *The subpartnership issue*

■ Frank was a one-fourth member of a partnership called Town & Country Motels, composed of Marcello, Frank, Rosario, and Salvador Marcello, Marcello's brother. The partnership was not evidenced by a written agreement. The Tax Court found that in 1954 Frank's mother, Santa Occhipinti, gave Frank $10,000, and that from 1954 until Town & Country was disposed of in 1962 Santa received in varying sums but at regular intervals money which

she reported for income tax purposes as the receipts from a one-third share of Frank's one-fourth interest in Town & Country. It appears to be undisputed that these sums were received in the form of checks from Town & Country made out to Santa, that after the partnership was disposed of in 1962 Frank received periodic payments from the purchasers as part of the consideration for his share, and that he continued to make payments to his mother.

Frank took the position that he and his mother created an informal but nevertheless valid subpartnership under the provisions of Article 2871 of the Louisiana Civil Code,[20] and that the sums she received represented her share of his share of the proceeds from Town & Country. The Commissioner determined that no subpartnership existed and that the sums paid Santa should be included in Frank's income, and the Tax Court upheld this determination. As to this issue, we reverse.

In reaching its conclusion, the Tax Court decided that Santa owned no capital interest in the subpartnership. Also, while the court recognized that a partnership valid for income tax purposes could be created under Article 2871, United States v. Atkins, 191 F.2d 146, rev'g, 189 F.2d 414, rehearing denied, 191 F.2d 951 (5th Cir. 1951), and that the absence of a formal agreement was not fatal to a finding of the existence of a partnership, it felt that other evidence militated against such a finding. The court relied particularly upon the absence of a showing that the $10,000 which Santa allegedly contributed approximated one-third of the cost or value of Frank's one quarter interest in Town & Country, the absence of a showing that the sums which Santa received from Town & Country approximated one-third of Frank's distributive share

20. Which, in relevant part provides:
    "Every partner may, without the consent of his partners, enter into a partnership with a third person, for the share which he has in the partnership, but he can not, without the consent of his partners, make him a partner in the original partnership, should he even have the administration of it."

of the proceeds therefrom, and the absence of a showing that the sums which Santa received after 1962 represented a portion of the proceeds from the sale of Town & Country. Ultimately the court concluded that "Frank gave her this money, not as a subpartner, but rather in order to discharge his duty as her son to care for her support." 28 CCH Tax Ct. Mem. at 972.

We recognize that much of the determination of the existence *vel non* of a partnership is factual in nature. However, insofar as this is a factual question, we have concluded that the decision below was to some extent "induced by an erroneous legal standard [and does] not have the F.R.Civ.P. 52(a) clearly erroneous insulation." Manning v. M/V "Sea Road," 417 F.2d 603, 607 (5th Cir. 1969); *see* United States v. Singer Mfg. Co., 374 U.S. 174, 194 & n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823, 838 & n. 9 (1963).

First, we disagree with the Tax Court's strong reliance on the fact that, although Santa's agreed share of the alleged subpartnership was one-third, there was an absence of evidence to show that the $10,000 which she allegedly gave Frank, and the sums which she received from Town & Country, were in proportion to one-third of Frank's interest in Town & Country and one-third of his distributive share therefrom, respectively. Often the family partnership or subpartnership is created as a device for splitting income among family members, Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 746, 69 S.Ct. 1210, 93 L.Ed. 1659, 1667 (1949), and one of the methods by which this might be accomplished would be to have an entering family member contribute capital of nominal value and then, by partnership agreement, be accorded a stated interest in, and receive a distributive share from the partnership which is disproportionately large in comparison with the capital contribution. Thus, in policing family partnerships the Commissioner and the courts must be sensitive to this sort of disproportionality.

However, we consider disproportionality not a prime factor in determining whether a valid partnership has been created, but only in determining the extent to which the reallocation of income through the partnership will be recognized for income tax purposes. The Supreme Court has observed that in determining the existence of a partnership the "question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * *." Commissioner of Internal Revenue v. Culbertson, *supra*, at 742, 69 S.Ct. at 1214, 93 L.Ed. at 1665. And the Code explicitly provides that "a partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement." IRC § 704(a). These alone carry the implication that a valid partnership may be created despite a lack of proportionality between a partner's contribution to the partnership and his interest in and distributive share from the organization. Moreover, in the case of family partnerships the Code, § 704(e),[21] contains explicit rules designed to handle the problem of disproportionality. In particular, § 704(e) (2) provides, *inter alia*, that regardless of where the incoming partner acquires the capital which he contributes to the partnership,[22] "the distributive share of the [incoming partner] under the partnership agreement shall be includible in his gross income * * * except to the extent that the portion of such [distributive] share attributable to [capital donated by the incoming partner] is proportionately

21. 26 U.S.C. § 704(e).

22. Section 704(e) (2) in terms speaks only of partnerships created by gift, but § 704(e) (3) provides that "for purposes of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller * * *."

greater than the share of the donor [23] attributable to the donor's capital." In essence, where an incoming partner receives a distributive share disproportionate to his capital contribution, the Code requires that that part of his distributive share which is disproportionate remain taxable to the donor, in this case Frank.

The existence of this provision, clearly designed to remedy the vice of disproportionality, carries the implication that disproportionality does not wholly invalidate the partnership for income tax purposes. Consequently the Tax Court's extensive reliance on the absence of a showing of proportionality in determining that no partnership existed was misplaced. To the extent that the absence of a showing of proportionality is relevant, it is only a factor to be considered in resolving the crucial question of intent, discussed below. *Cf.* Commissioner of Internal Revenue v. Culbertson, *supra,* at 741–743, 69 S.Ct. at 1213–1214, 93 L.Ed. at 1664–1666.

Second, we think the Tax Court must better explain its conclusion that Santa owned no capital interest in the alleged subpartnership. The court found as a fact that in 1954 Santa gave Frank $10,000, and it offered no reason why this $10,000 did not constitute a contribution to the alleged subpartnership's capital and thereby endow Santa with a capital interest. The ownership of a capital interest may be relevant to the question of intent.[24] If on remand the Tax Court again concludes that Santa contributed no capital to the subpartnership, it should adduce some reasons why the $10,000 did not constitute such a contribution.

Finally, the Tax Court should reexamine its statement that "Frank gave [Santa] this money, not as a subpartner,

but rather in order to discharge his duty as her son to care for her support," particularly if it concludes that the $10,000 gave Santa a capital interest in the alleged subpartnership. The crucial "question whether the family partnership is real for income-tax purposes depends upon 'whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both,'" Commissioner of Internal Revenue v. Culbertson, *supra,* at 742, 69 S.Ct. at 1214, 93 L.Ed. at 1665, *quoting* Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 287, 66 S.Ct. 532, 90 L.Ed. 670, 674 (1946), and a finding or conclusion on intent is a prerequisite to the resolution of whether a partnership existed for purposes of the income tax laws. The Tax Court's statement is ambiguous. It can be construed to mean that Frank lacked the requisite intent to create a partnership *and* that he was acting out a desire to discharge his filial obligations, or to mean that he lacked the necessary intent *because* he was motivated by a desire to care for his mother. If the court meant the latter, then its legal premise—that the desire to discharge familial obligations and the intent to create a valid partnership are always mutually exclusive—was faulty. Because it is "possible for [a taxpayer] to shift tax incidence by surface changes of ownership without disturbing in the least his dominion and control over the [assets of the partnership] or the purposes for which the income from the property is used," Commissioner of Internal Revenue v. Culbertson, *supra,* 337 U.S. at 746, 69 S.Ct. at 1216, 93 L.Ed. at 1667, and because family partnerships consequently offer a convenient method for a taxpayer to discharge his familial obligations while simultaneously reduc-

---

23. Obviously, when the capital interest is acquired by actual purchase, but required by § 704(e) (3) to be considered as created by gift, the term "donor" includes the actual seller.

24. A finding that Santa had a capital interest does not of itself mean that the partnership, although valid under state law, is valid for income tax purposes. Commissioner of Internal Revenue v. Culbertson, *supra.* The Tax Court must still resolve the question of intent, discussed below.

ing his tax bill, such partnerships are accorded particular scrutiny income-tax wise. Nevertheless, they may be valid under the income tax laws, *e. g.*, Scofield v. Davant, 218 F.2d 486, 489 (5th Cir. 1955); Commissioner of Internal Revenue v. Culbertson, *supra;* IRC § 704(e) (1), and the desire to discharge filial obligations and the intent to create a valid partnership may coexist. Obviously, the creation of a valid partnership is more likely where a family member contributes funds acquired from sources apart from the other partners,[25] but, regardless of the source of funds, the ultimate question remains not whether the creation of the partnership was motivated in part by family ties but whether the intent necessary to create a valid partnership was present or absent. On remand, the issue of intent should be resolved.

As to the creation of a subpartnership between Santa and Frank Occhipinti, the decision of the Tax Court is reversed and remanded for further proceedings not inconsistent with this opinion; in all other respects the decisions of the Tax Court are affirmed.

---

**25.** The record is silent as to the source of the funds contributed by Santa.