ELLSWORTH C. HOLMAN and GWEN HOLMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent AFTER HOURS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Holman v. Commissioner
Docket Nos. 1299-72, 1300-72.
United States Tax Court
T.C. Memo 1973-279; 1973 Tax Ct. Memo LEXIS 6; 32 T.C.M. (CCH) 1323; T.C.M. (RIA) 73279; December 26, 1973, Filed. *6 In 1968, Ellsworth C. Holman withdrew $14,250 from After Hours, Inc., a corporation in which he was a fifty percent shareholder. The withdrawals were to be repaid if the corporation needed the money for its business operations. Held, the withdrawals were not loans, but distributions of property made by a corporation with respect to its stock. Section 301, I.R.C. 1954. Ellsworth C. Holman advanced funds to his son-in-law and nephew in 1968. He also alleged that a former business associate signed a note in consideration for dropping criminal charges for embezzled checks. Held, none of the "debts" created a bona fide debtor-creditor relationship. After Hours, Inc. paid a promissory note on which Ellsworth C. Holman was personally liable. Held, such payments resulted in constructive dividends to Holman. 2 After Hours, Inc. paid, directly or indirectly, the creditors of Famous Names, Inc., an unrelated corporation. There was no intent on either party that the amounts so expended were intended to be loans. Held, the amounts expended by After Hours, Inc. are not deductible business bad debts. Section 166(a), I.R.C. 1954. Held further, such amounts are not deductible as ordinary *7 and necessary business expenses. Section 162, I.R.C. 1954. John H. Withers, for the petitioners. Tom G. Parrott, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in the income taxes of petitioners for the years and in the amounts as follows: Ellsworth C. and Gwen Holman Year
Deficiency
Addition to Tax Sec. 6653(a)
1967
$ 6,239.27
$311.96
1968
14,403.99
720.20
After Hours, Inc.
Year Ending
Deficiency
September 30, 1968
$8,180.69
The parties have settled several issues. The issues remaining for decision are: (1) Whether withdrawals from After Hours, Inc. by Ellsworth C. Holman constitute loans or distributions of property subject to treatment under section 301, Internal Revenue Code of 1954; [1] 3 (2) Whether Ellsworth C. and Gwen Holman are entitled to nonbusiness bad debt deductions under section 166(d) for advancements of funds to a son-in-law and a nephew, or for an alleged debt owed by a former business associate; (3) Whether the payment by After Hours, Inc. of a promissory note on which Ellsworth *8 C. Holman (fifty percent shareholder of After Hours, Inc.) was personally liable resulted in the payment of a constructive dividend; and (4) Whether the payment by After Hours, Inc. of debts owed by an unrelated corporation are deductible as a business bad debt under section 166, deductible as an ordinary and necessary business expense under section 162 or nondeductible as a capital expenditure. FINDINGS OF FACT General Some of the facts have been stipulated and are found accordingly. Ellsworth C. Holman (hereinafter referred to as petitioner) and Gwen Holman are husband and wife who were legal residents of Dallas, Texas, when the petition was filed. They filed their joint Federal income tax return for 1968 with the district director of internal revenue in Dallas, Texas. [2] 4 After Hours, Inc. (hereinafter referred to as After Hours) was incorporated on April 13, 1967 in the State of Texas. After Hours filed its corporation income tax return for the taxable year October 1, 1967 to September 30, 1968 with the district director *9 of internal revenue in Dallas, Texas. At the time of the filing of the petition, After Hours' principal office was located in Dallas, Texas. Issue 1. Classification of Funds Distributed to E. Holman as Loans or Dividends. After Hours was engaged in the business of distributing miniature aerosol breath fresheners in the United States and was wholly owned by R. E. Williams (hereinafter referred to as Williams) until November 1967. At that time, petitioner and John M. Tanner (hereinafter referred to as Tanner) purchased shares in After Hours so that Williams, Tanner and petitioner each owned one-third of the outstanding common stock of that corporation. On April 1, 1968, a special board of directors meeting was held at which Tanner and petitioner were present. At the meeting, it was voted to relieve Williams of his duties as an officer and director of After Hours. It was also voted that commissions received by and all commissions due Williams would be charged against him for nonperformance on an agreement to hire, train and maintain a crew. It was further voted that the salary of the president and vice president of After Hours would be $2,000 per month, plus payment of expenses *10 while on company 5 business. Tanner became president of After Hours and petitioner became vice president. In October 1968, Tanner and petitioner purchased the After Hours stock of Williams so that from that time on they each owned fifty percent of the stock. During 1968, petitioner received commissions from After Hours in the amount of $10,600 and Tanner received commissions of $13,042.07. After Hours also distributed $14,250 to petitioner in 1968 as follows: Date
Check No.
Amount
Notation on Check
9-28-68
760
$ 1,500
Salary Advance
10-14-68
807
1,000
11-1-68
904
3,500
Salary Adv.
11-15-68
964
3,000
Salary Advance
12-1-68
1048
2,750
Salary Advance
12-14-68
1113
2,000
Salary Advance
12-20-68
1146
500
Salary Adv.
Total
$14,250
The checks were signed by Tanner and petitioner. During the same period, After Hours distributed to Tanner seven checks aggregating $14,250. The withdrawals made by Tanner and petitioner were to be repaid only if After Hours needed money for its operations. During 1968, neither Tanner nor petitioner received any of the salary voted to be paid the corporate officers at the April 1, 1968 board of directors meeting; however they were paid retroactively on September 30, 1969. The $14,250 payments *11 received by petitioner and Tanner were originally recorded on the books of After Hours, as commissions. By the following 6 journal entry on the books of After Hours, dated December 31, 1968, these amounts were removed from the commissions account and charged to two accounts for advances of officers as follows: Date
Items
Debits
Credits
1968-69
Dec. 31
Advance to officer - John Tanner
$14,250
Advance to officer - E. C. Holman
14,250
Commissions to reclassify advances for the three months of October, November, December, 1968.
$28,500
Petitioner signed a six percent interest-bearing note in the amount of $14,250 purportedly dated December 6, 1968.The note, however, was signed subsequent to June 9, 1970. The ink used to sign the note was a type called formula 901, manufactured by Formulabs, Inc. (hereinafter referred to as Formulabs) of Escondido, California. The first production batch of formula 901 ink was not manufactured until July 22, 1969. Formula 901 ink was first put into commercial production on June 9, 1970. Formula 901 ink contains a white fluorescent tracer that is not present in inks produced by any other manufacturer. ULTIMATE FINDING OF FACT The distributions of $14,250 to petitioner *12 in taxable year 1968 were not intended to be loans from After Hours. Issue 2. Bad Debt Deductions. On July 27, 1968, petitioner issued a check in the amount of $3,000 to Richard Daluge (hereinafter referred to as Daluge) marked with the notation "Loan for d/p on truck." As of that 7 date, Daluge was petitioner's son-in-law. No promissory note was ever signed with regard to the $3,000 advancement. Petitioner personally contacted Daluge with regard to the advancement but did not take legal action of any type to collect the money. On October 26, 1968, petitioner issued a check in the amount of $3,500 to Sherwood R. Johnson (hereinafter referred to as Johnson) marked with the notation "Loan." Johnson is a nephew of petitioner. No promissory note was ever signed with regard to this advance. Petitioner took no legal action to collect the sums advanced to Johnson and hoped to collect money from Johnson at some future time provided that the latter obtained some money. In 1966, petitioner was associated with Tyrus Cobb (hereinafter referred to as Cobb) in a company called Tech Research, which was in the business of selling hot lather shaving cream. Alleging that Cobb embezzled funds *13 from Tech Research, petitioner brought criminal action against him in the criminal courts of Texas. On August 1, 1967, petitioner and Cobb signed an agreement as follows: That We, E. C. HOLMAN and TECH RESEARCH INDUSTRIES, and each of us, in consideration of the execution by TYRUS R. COBB and MRS. STELLA COBB, of a note in the sum of THREE THOUSAND DOLLARS ($3,000.00), do hereby release and fully discharge Tyrus R. Cobb from any and all claims, demands and actions, which either of us may have, growing out of or connected with all prior business transactions and involvements between Tyrus R. Cobb and either of the undersigned. 8 Further, in consideration of said payment, it is hereby agreed that this settlement is being made purely upon a compromise basis in order to avoid trouble, litigation and expense, and that neither Tyrus R. Cobb, nor E. C. Holman nor Tech Research Industries, admit any liability to each other or to anyone else growing out of or connected with any such business involvements. Further, by his signature hereto, and in consideration of these execution hereof by E. C. Holman and Tech Research Industries, Tyrus R. Cobb does hereby release, acquit and forever discharge *14 E. C. Holman and Tech Research Industries from all claims for commissions, salaries or expenses, arising out of said business involvements. WITNESS our signatures this 1 day of August, 1967. Petitioner personally attempted to contact Cobb to collect the money that was allegedly due. Petitioner visited the home of Cobb's mother, where he thought the latter lived but was unable to locate him. Petitioner took no legal actions to collect the amount allegedly due. Issue 3. Constructive Dividend. Issue 4.Deductibility of Amounts Paid on Debts of Another Taxpayer. Famous Names, Inc. (hereinafter referred to as Famous Names) was in the business of bottling cologne and manufacturing greeting cards. From at least mid-1967, Tanner was president and sole shareholder of Famous Names. Financially, Famous Names was not successful and it owed many creditors.As Tanner was president of both Famous Names and After Hours, the former's financial problems had an adverse effect upon the latter in 9 starting its business. In order to clear up the poor credit rating of Famous Names and enable After Hours to proceed in its business enterprises, petitioner and After Hours began a program whereby *15 funds were advanced to or for the benefit of Famous Names. On December 15, 1967, petitioner and James W. Burke (hereinafter referred to as Burke) signed a ninety-day note for $15,00 payable to the Fair Park National Bank (hereinafter referred to as the bank) of Dallas, Texas. Burke was a friend and business associate of petitioner. The $15,000 received on the note was deposited in the bank account of Famous Names, and was utilized to pay some of its creditors. That note was satisfied as follows: On March 19, 1968, After Hours issued a check of $2,700 to the bank and petitioner issued a check of $2,596.88 to the bank, both of which were applied to reduce the note to a balance of $10,000. Also on March 19, 1968, petitioner, Burke and Tanner executed a $10,000 ninety-day promissory note for the balance of the original note executed on December 15, 1967. After Hours reimbursed petitioner for his payment in March 1968, by issuing two checks aggregating $2,600 to him in May 1968. Then on June 3, 1968, After Hours issued a check to the bank in the amount of $10,158.33. This amount was in payment of the note signed on March 19, 1968 by Tanner, Burke and petitioner. 10 After Hours *16 made direct payments to or for the benefit of Famous Names during its taxable year October 1, 1967 through September 30, 1968, as follows: Payee and Check Number
Amount
Famous Names - 130, 131, 136, 150, 155, 157, 161, 162, 164, 171, 194, 208, 215
$10,297.00
Olevetti Underwood - 167 and 196
411.42
Allied Concord Financial Corporation - 226 and 280
87.96
Fair Park National Bank - 168, [3] 252, 253, 322, 346, 368, 397, 428, 515, 547 and 681
15,266,23
Harrison & Withers, Attorneys - 298
250.00
Republic National Bank - 278, 325 and 367
36.50
E. C. Holman - 303 and 321
2,600.00
I.D.S. Leasing Corporation - 324
28.82
Fred F. Nolan - blank, 448 and 562
2,400.00
State of Texas Comptroller - blank
117.29
Frontier Printing - blank
73.90
Bland, Garvey & Co. - 382
50.00
Robert S. Calvert, Comptroller of Public Accounts - 446
44.00
Precision Silk Screen Company - 499
462.40
Total
$32,125.52 11 All of the money advanced by After Hours was utilized to pay the creditors of Famous Names. The board of directors meeting held on April 1, 1968, stated that past expenditures *17 for Famous Names were done with the approval of two-thirds of the majority of After Hours stockholders and "the purpose being to protect Famous Names, Inc. as well as After Hours, Inc. in order that both companies may enjoy a good business relationship with both companies bank and creditors." The meeting also approved future actions to help Famous Names, as long as two-thirds of the shareholders agree. After Hours determined that the poor credit rating of Famous Names was having an adverse effect on its attempt to establish a distribution system. This was so because of the fact that Tanner was an officer of both corporations. After Hours was also unable to get newspaper advertising because Famous Names owed advertising debts. During the period January 3, 1968 to August 31, 1968, Famous Names transferred cash and property in the net amount of $6,401.20 to After Hours, for which it was given credit on the latter's books. There was never any business relationship between After Hours and Famous Names. The advances were not considered loans, but were made to help After Hours. As a result of the poor financial condition of Famous Names, there was little likelihood that any of the *18 amounts could have been repaid. After Hours never made any effort to collect the amounts advanced. 12 On its corporation income tax return for the period October 1, 1967 through September 30, 1968, After Hours deducted $25,724.32 ($32,125.52 - $6,401.20) as a worthless bad debt. OPINION Issue 1. Classification of Funds Distributed to E. Holman as Loans or Dividends. The first issue is whether the withdrawals of $14,250 by petitioner from After Hours in 1968 should be characterized as loans or distributions to petitioner in his capacity as a shareholder. Petitioner contends that it was the intent of After Hours and himself that the withdrawals be loans. Respondent contends that the withdrawals are not bona fide loans, but rather distributions from After Hours with respect to its stock which are taxable to petitioner as dividends under sections 301 and 316. [4] *19 13 The determination whether *20 corporate disbursements are loans or dividends is dependent upon whether the taxpayer intended, at the time the withdrawals were made, to repay. Intent to repay or retain the sums disbursed is a question of fact to be determined by consideration of all the circumstances in each case. Bayor Verret Land Co. v. Commissioner, 450 F.2d 850, 857 (C.A. 5, 1971), affd. 52 T.C. 971 in part; Walter K. Dean, 57 T.C. 32 (1971); and Jack Haber, 52 T.C. 255 (1969), affd. per curiam 422 F.2d 198 (C.A. 5, 1970). When the recipients of the distributions are also in substantial control of the corporation, such control invites close scrutiny of the transaction. William C. Baird, 25 T.C. 387 (1955). After examination of all of the facts in this case, we hold that the 14 $14,250 distributed to petitioner in 1968 did not represent bona fide loans but were distributions by After Hours with respect to their stock which are taxable as dividends to petitioner to the extent of that corporations' earnings and profits. The primary basis for our holding is the testimony of petitioner. When questioned with regard to the $14,250 withdrawn by him between September and December 1968, petitioner testified as *21 follows: Q Well, it [After Hours] paid you $14,250, did it not? A That is right. We happened to have a couple of good months, and so we loaned some money, knowing that if After Hours needed the money, we would pay it back, if they had a small sales month or needed the money for any other purposes. * * * Q On December the 31st - or on January the 1st, 1969, tell the Court whether or not you would have repaid $14,000, had the company needed it. A If After Hours needed the money, I certainly would have. Tanner testified similarly when questioned on the amounts distributed to him, as follows: Q Were you prepared to pay back $14,250 if the company needed it? A If the company needed it. This testimony clearly shows that there was no intent on the part of the parties that the distributions by loans, as they were to be repaid only on the contingency that After Hours 15 needed the money. The testimony of Tanner and petitioner also shows that there was no intent on the part of the corporation to demand repayment except upon happening of the contingency, since they were the parties in control of the corporation who would have been required to institute proceedings to obtain repayment. See *22 Anson Beaver, 55 T.C. 85, 91 (1970), and Electric & Neon, Inc., 56 T.C. 1324, 1329 (1971), on appeal (C.A. 5, Sept. 7, 1973).Furthermore, petitioner's testimony shows that he was aware that he was withdrawing the profits of the corporation, the very essence of a dividend distribution. The fact that Tanner and petitioner intended to "repay" the sums to After Hours if it needed funds to operate its business is not atypical of the operation of a closely held corporation, which often finds it necessary to obtain funds from its shareholders in order to meet its requirements. It does not, however, alter the characterization of sums distributed to shareholders at a time when the distributing corporation has earnings and profits. Petitioner contends that he has proved that he had an intent to repay the amounts distributed at the time of withdrawals by introduction of an interest-bearing promissory note that is dated December 6, 1968. Respondent contends that the note was not signed in 1968. Respondent presented two expert witnesses who testified that the ink used to sign the note was not manufactured until after June 9, 1970. Mr. 16 Richard Brunelle, Acting Chief of the Identification *23 Branch of the Bureau of Alcohol, Tobacco and Firearms, National Office Laboratory, Washington, D.C., testified that the note was signed with formula 901 ink. His opinion was based upon the dye composition of the ink and the presence of a fluorescent marker. Mr. Glenn F. Roquemore, Technical Director of Formulabs, testified that formula 901 ink was first manufactured on July 22, 1969, and first put into production on June 9, 1970. He also testified that, because of the presence of the white fluorescent tracer, there was no possibility that the ink could be anything but formula 901 ink produced by Formulabs. Petitioner, relying on the case of United States v. Bruno, 333 F. Supp. 570 (E.D. Pa. 1971), contends that the ink analysis evidence is not sufficient to prove that the note was not signed in December 1968. In Bruno, the district court rejected the expert testimony of Mr. Brunelle with regard to the determination of the date on which a document had been signed. That court found that Mr. Burnelle's methods were inadequate and that a great number of foreign inks could not be excluded from identification. The district court concluded that the field of ink identification was not *24 sufficiently advanced to be reasonably scientifically certain. At this time, it is not necessary to determine whether the procedures of ink analysis or the testimony of ink analysis experts is acceptable in all cases. In this instance, Mr. Brunelle testified that 17 the ink used to sign the promissory note contained a distinctive white fluorescent marker present in formula 901 ink. Mr. Roquemore testified that the white fluorescent marker excluded the possibility that the ink was anything but formula 901 ink. Also, the producer of the ink purportedly used in the Bruno case testified that the composition of its ink could have changed over a period of time. These factors distinguish the present situation from the Brune case.
Petitioner attempts to explain the fact that the note offered into evidence may have been signed after December 6, 1968, by stating that, as a result of the subsequent attempt to register After Hours stock, new notes were drawn up and signed. He contends, however, that a note was executed on December 6, 1968, and he believes the note offered in evidence to be that note. Petitioner has the burden of proving that he signed a promissory note in December 1968. His *25 self-serving testimony, in light of the testimony offered by Mr. Brunelle and Mr. Roquemore, is not sufficient to meet that burden. This is especially so in light of the fact that petitioner's testimony regarding the subsequent signing of new notes was offered after the damaging testimony of the expert witnesses. The fact that the promissory note could not have been signed until after June 9, 1970, provides cogent evidence that repayment was not contemplated at the time the distributions 18 were made. Such fact evidences an attempt after the fact to characterize the distributions as loans. See William C. Baird, 25 T.C. 387 (1955). Two other factors militate against the conclusion that the distributions were intended to be loans. First, no evidence was presented that any repayments had been made on the loans. Second, distributions to Tanner and petitioner were proportionate to their shareholders' interests vis-a-vis each other during the entire period of withdrawals. Taking into account all of the factors stated above, we hold that the $14,250 withdrawn by petitioner in 1968 did not represent loans, but rather corporate distributions subject to the provisions of section 301 and *26 316. Issue 2. Bad Debt Deductions. The second issue is whether petitioner is entitled to nonbusiness bad debt deductions for the amounts advanced to Daluge and Johnson or for the amount allegedly owed by Cobb. Section 166[5] allows short-term capital loss deduction treatment for any 19 nonbusiness bad debt which becomes worthless during the year. Both parties agree that the amounts in question are deductible, if at all, as nonbusiness bad debts. To qualify for deductions for worthless debts under section 166, a taxpayer must show that he and his alleged debtor intended to create a debtor-creditor relationship, *27 that a genuine debt in fact existed, and that the debt became worthless within the tax year. Section 1.166-1(c), Income Tax Regs., and Giffin Andrew, 54 T.C. 239, 245 (1970). Intra-family transactions are subject to special scrutiny. The taxpayer must show that there existed at the time of the transaction a real expectation of repayment and an intent to enforce collection of the indebtedness. Id. Petitioner has failed in all three instances to prove that (1) there were bona fide loans or (2) the alleged debts became worthless in 1968. With regard to the advances to Daluge and Johnson, the only evidence offered to prove the existence of bona fide debts were the checks marked "Loan" and petitioner's uncorroborated 20 testimony that the individuals intended to enter into a debtor-creditor relationship. That is not sufficient to establish the existence of a valid debt. Cf. Delta Plastics Corp., 54 T.C. 1287, 1292 (1970). Moreover, the absence of notes or other facts indicating that the alleged loans were to be paid within a fixed date with interest, when added to the family relationships present at the time of the advancements, militates against finding that a valid debt existed *28 for deduction under section 166. We hold for respondent on this question. With regard to the alleged debt owed by Cobb, petitioner presented only an agreement which refers to a note to be signed by Cobb in consideration for being released from all criminal charges. Petitioner testified that the note was signed by Cobb and was in the District Attorney's office at the time of the trial. The failure of a party to produce evidence within his control which, if true, would be favorable to him, gives rise to a presumption that if produced it would be unfavorable. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (C.A. 10, 1947). Petitioner has failed to prove that any debt was ever created between himself and Cobb. We hold for respondent on this question. Even if we determined that the Daluge, Johnson and Cobb "debts" created true debtor-creditor relationships, petitioner would not be entitled to bad debt deductions in 1968 because 21 he did not prove that they became worthless in that year. The determination of whether a debt is worthless is made upon consideration of all pertinent evidence. Section 1.166-2(a), Income Tax Regs. Legal action to enforce *29 payment is not necessary if the surrounding circumstances indicate a debt is worthless and uncollectable and legal action would in all probability not result in the satisfaction of the debt. Section 1.166-2(b), Income Tax Regs. Petitioner has failed to present any evidence whatsoever regarding the financial positions of Daluge, Johnson or Cobb either at the time the alleged debts were made or at the time of the alleged worthlessness. Petitioner merely testified that he personally attempted to collect from Daluge, Johnson and Cobb but they could not pay or could not be found and, therefore, the debts became worthless at that time. Such testimony reflects at best the unsupported judgment of petitioner as to when worthlessness occurred. Orrin W. Fox, 50 T.C. 813 (1968), affd. 25 AFTR 2d 70-891 (C.A. 9, 1970), 70-1 USTC § 9373. Furthermore, with regard to the advancement to Johnson, petitioner testified that he hoped to collect at some time in the future, thus showing that not even he believed that this "debt" was worthless. Issue 3. Constructive Dividend. The third issue is the characterization of payments made by After Hours with regard to the notes signed on December 15, 1967 *30 and March 19, 1968. Petitioner contends that they were payments 22 made by after Hours on behalf of Famous Names for which the former should be allowed deductions. Respondent contends that the amounts paid in satisfaction of the notes on which petitioner was primarily liable were constructive dividends in the total amount expended ($15,458.33). [6]
The crucial concept in finding a constructive dividend is that the corporation conferred an economic benefit on a shareholder without expectation of repayment. It is well settled that corporate payments in discharge of a shareholder's personal debts and liabilities are in the nature of constructive dividends. Bayou Verret Land Company v. Commissioner, 450 F.2d 850 (C.A. 5, 1971), affd. 52 T.C. 971 in part; United States v. Smith, 418 F.2d 589 (C.A. 5, 1969); Gibbs v. Tomlinson, 362 F.2d 394 (C.A. 5, 1966); and Irving Sachs, 32 T.C. 815 (1959), affd. 277 F.2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833 (1960). 23 The facts indicate that After *31 Hours made payments to petitioner or the bank for promissory notes on which petitioner was personally liable. This situation resulted in a direct economic benefit to petitioner. There is no evidence to indicate that After Hours expected repayment. Therefore, the situation falls within Bayou Verret Land Company v. Commissioner, supra.
Petitioner's only defense that the amounts are not constructive dividends is that the court should look to the substance rather than the form of the transaction. It is axiomatic that in tax litigation substance must prevail over form. Helvering v. F & R Lazarus & Co., 308 U.S. 252 (1939). The taxpayer as well as the government is entitled to the benefit of the rule that the substance rather than the form of a transaction controls. Frank Ciaio, 47 T.C. 447, 457 (1967). Petitioner contends that the substance of the transaction was that he lent his credit to After Hours to borrow money in order to pay the debts of Famous Names. We cannot accept petitioner's contention. The substance of the transaction is the same as the form. That is, the bank accepted two notes on which petitioner was liable. After Hours was at no time liable on either of the notes. *32 Petitioner may have intended to obtain a loan for After Hours on which he would be a guarantor; however, the action taken by the parties did not reach that result. The payments were not liabilities of After Hours, but of petitioner. 24 We therefore, find that the After Hours payments were a direct benefit to petitioner. Having found that the payments of the two notes resulted in constructive dividends, we now are faced with the question of determining the proper amount to be attributed to petitioner. Respondent has attributed the entire amount of such payments to petitioner. We disagree with the attribution. With regard to the original note, the payments by After Hours resulted in the release of the primary liability of one of its shareholders, petitioner. [7] Therefore, the amounts so paid ($5,300) are constructive dividends to petitioner. On the other hand, the payments made on the second note signed March 19, 1968, resulted in the release of primary liability of Tanner, as well as petitioner. The payment of $10,158.33, therefore, resulted in a corporate distrubution by After Hours pro rata to two of its shareholders, namely Tanner and petitioner. As such, only one-half of *33 that amount ($5,079.17) is taxable to petitioner as a constructive dividend. We hold that petitioner received a constructive dividend distribution in the amount of $10,379.17 ($5,300 and $5,079.17) resulting from the release of liability on notes on which he was personally liable. To the extent it is covered by earnings 25 and profits of After Hours, it is taxable to petitioner as a dividend. Issue 4. Deductibility of Amounts Paid on Debts of Another Taxpayer. The fourth issue is the characterization of the amounts paid by After Hours to or for the benefit of Famous Names. On its corporation income tax return, After Hours deducted the amounts expended, less the amount of credits for property received from Famous Names, as a worthless business bad debt under section 166(a). After Hours contends that the amounts expended were loans to Famous Names which were intended to be repaid. Alternatively, After Hours claims that the amounts are deductible as ordinary and necessary business expenses under *34 section 162. Respondent claims that the expenditures are deductible neither as a business bad debt nor as ordinary and necessary business expenses. On the contrary, respondent contends that the expenses were more akin to capital expenditures made to obtain reputation and improved credit ratings. As a result of our finding that amounts expended by After Hours to pay the notes signed by Tanner and petitioner resulted in constructive dividends, those payments cannot be classified as deductible expenses of a corporate taxpayer. See United States v. Smith, 418 F.2d 589, 596 (C.A. 5, 1969). Thus, the amount to be classified as a deduction or capital expenditure is that amount deducted by After Hours as a bad debt less the amount of the constructive dividends. 26 We first shall consider the question whether After Hours is entitled to a bad debt deduction. Section 166(a)[8] allows a deduction for any business bad debt that becomes worthless during the year. To be entitled to a bad debt deduction, the taxpayer must rpove that a valid debt exists. The facts of this case present no evidence on which a bona fide debtor-creditor relationship can be found. Tanner, president of both After *35 Hours and Famous Names at the time the expenditures were made, testified that the advances "* * * were not really loans to Famous Names." No promissory notes were ever issued with regard to the sums allegedly loaned, nor was any security given. Also, there is no evidence to indicate that a date of repayment was agreed to by the parties or an interest rate established. Furthermore, Tanner testified that at the time the amounts were advanced there was little, if any, likelihood that the amounts could ever be repaid by Famous Names. In fact, he testified that from January or February 1968, Famous Names lost twice as much as it made on each sale of its products. It is clear that After Hours continued to make advances to or for Famous Names long after it was obvious that Famous Names had no hope of ever repaying. Advances made with the belief that they would not be repaid are not deductible as bad debts. Putman v. Commissioner, 352 U.S. 82 (1956), American Cigar Co. v. Commissioner, 66 F.2d 425 (C.A. 2, 1933), affirming 21 B.T.A. 46427 (1930), certiorari denied 290 U.S. 699 (1933), and John B. Garrett, Jr., 39 T.C. 316 (1962). It is obvious from the facts of this case that no debtor-creditor *36 relationship was even created or even intended. Thus, no bad debt deduction is allowable under section 166. We find for respondent on this question. We now shall consider After Hours' alternative contention that the expenditures are deductible as ordinary and necessary business expenses under section 162. [9]Expenditures made to protect an established business are deductible as ordinary and necessary business expenses. C. Doris H. Pepper, 36 T.C. 886 (1961), and Edward J. Miller, 37 B.T.A. 830 (1938). After Hours contends that the expenditures were made to promote and protect its business and credit rating. Respondent contends that the expenditures were made in an attempt to establish, not protect, the business reputation of After Hours. Upon consideration of all the facts in this case, we hold for repondent on this issue. We see no difference between the present facts and those in Welch v. Helvering, 290 U.S. 111 (1933), and Carl Reimers Co., 19 T.C. 1235 (1953), affd. 211 F.2d 66 (C.A. 2, 1954). [10] In 28 Welch, the taxpayer paid the claims of former customers of a bankrupt corporation, of which he had been an officer, in order to strengthen his individual *37 standing and credit, and to reestablish business relations with the corporation's former customers. In Reimers, the taxpayer paid a portion of claims of former customers of a bankrupt corporation in order that it might be granted recognition by newspaper publishers' associations which would permit it to establish business relations with their members on a credit basis. The president of the taxpayer corporation, in Reimers, had been an officer and majority shareholder of the bankrupt corporation. In the present case, After Hours paid (directly or indirectly) the debts of a company in which its president was an officer and sole shareholder. This was done with the purpose of being able to establish a business relationship with distributors and in order to assure that After Hours could obtain newspaper advertising. As a young corporation After Hours needed to establish that it was a company operated by people *38 of good reputation in order to attract distributors and obtain advertising in newspapers. To do so it believed that it had to clear up the debts of Famous Names. After Hours, therefore, voluntarily paid the debts of Famous Names. As such, the case is indistinguishable from the Reimers case. We hold that the payments were made to acquire business or good will and, therefore, are regarded as captial in nature, not deductible under section 162. 29 In defense of its position, After Hours cites A. Harris & Co. v. Lucas, 48 F.2d 187 (C.A. 5, 1931), reversing 16 B.T.A. 705 (1929) and L. Heller & Son, Inc., 12 T.C. 1109 (1949). Both of these cases are distinguishable from the present case. First, in A. Harris & Co., supra, the taxpayer was a corporation that went through bankruptcy proceedings in which its creditors were paid fifty cents on the dollar. After the bankruptcy, the taxpayer attempted to continue doing business for four years but determined that the failure to pay its past creditors was adversely affecting its business. The taxpayer thereby paid the remaining debts owed to its former creditors. In that case, the taxpayer paid obligations for which it at least felt morally *39 obligated and for which it had once been legally liable. See Western Maryland Dairy Corporation, 32 B.T.A. 769 (1935). The expenses in the A. Harris & Co. case were those of the taxpayer itself that had been entailed by it during a long period of doing business. In the present case, After Hours paid the expenses of a corporation which it was not even related to in business. The situations are clearly different. Second, in L. Heller & Son, Inc., supra, the taxpayer was a corporation whose wholly owned subsidiary went through bankruptcy proceedings. The taxpayer, in order to retain a good business reputation in the jewelry business in which it had been for over thirty years, paid certain "jewelry" creditors 30 of its subsidiary.In that case, the taxpayer was related to the subsidiary and had a high reputation and excellent credit standing at the time it made the payments. In the present case, After Hours was attempting to establish a good reputation, not defend one that had been established over a thirty-year span of doing business. Also, in Heller, the taxpayer paid only those creditors with which it would be dealing in its business. After Hours, however, paid all of the creditors *40 of Famous Names. Further, the relationship between the taxpayer and its subsidiary provides a marked distinction to the present case, in which the two corporations were in no way related. Decision will be entered under Rule 50 in docket No. 1299-72. Decision will be entered for the respondent in docket No. 1300-72. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated. ↩
2. With regard to Ellsworth C. and Gwen Holman, only the deficiency for 1968 is in dispute, the parties having agreed on the amount of deficiency for 1967. ↩
3. On January 31, 1968, After Hours issued a check payable to Fair Park for $2,700.00 of which $200.00 was applied as payment on a note of Famous Names at the Bank. ↩
4. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General. - Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). (c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount constituting dividend. - That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301↩ applies, such distribution shall be treated as a distribution of property for purposes of this subsection. 5. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where the nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. ↩
6. This amount consists of the following checks paid on the notes or reimbursed to petitioner for his payment on the notes: ↩ Check No.
Amount
253
$ 2,700.00
303
1,800.00
321
800.00
346
10,158.33
$15,458.33
7. Under the laws of the State of Texas, joint makers of a promissory note are primarily, jointly and severally liable to the payee. Hall v. McGregor, 431 S.W. 2d 369↩ (Tex. Civ. App., 1968). 8. See footnote 5. ↩
9. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *. ↩
10. See also Jones Beach Theatre Corp., T.C. Memo. 1966-100↩.